DARCY PAUL (248940)
LAW OFFICES OF DARCY AUGUST PAUL
3235 Kifer Road, Suite 360
Santa Clara, CA 95051
Telephone:  (408) 617-0800
Facsimile:  (408) 617-0810
Email:  dapaul@darcypaul.com

Attorney for Plaintiff
DANIEL FISHER

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DANIEL FISHER, an individual resident in California<br><br>Plaintiff,<br><br>v.<br><br>BIOZONE PHARMACEUTICALS, INC., a Nevada corporation, BIOZONE LABORATORIES, INC., a California corporation, THE FROST GROUP LLC, a Florida company, BRAUSER HONIG FROST GROUP, a Florida entity of unknown form, PHILLIP FROST, an individual resident in Florida, MICHAEL BRAUSER, an individual resident in Florida, BARRY HONIG, an individual resident in Florida, ELLIOT MAZA, an individual resident in California and New Jersey, BRIAN KELLER, an individual resident in California, ROBERTO PREGO-NOVO, an individual of unknown residence, DOES 1-150, Inclusive,<br><br>Defendants. | Civil Action No. C 12-03716 WHA<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Daniel Fisher ("Plaintiff" or "Fisher"), for all causes of action against defendants BioZone Pharmaceuticals, Inc. ("BP"), BioZone Laboratories, Inc., The Frost Group, Brauser Honig Frost Group ("BHFG"), Phillip Frost ("Frost"), Michael Brauser ("Brauser"), Barry Honig ("Honig"), Elliot Maza ("Maza"), Brian Keller ("Keller"), and Roberto Prego-Novo ("Prego-Novo") (collectively, the "Defendants"), states and alleges through his attorney as follows:

## NATURE OF THIS ACTION

1.      This lawsuit arises from an illegal scheme by a group of predatory investors utilizing facially despicable methods to deprive plaintiff Daniel Fisher, a business owner adding deeply-rooted and substantive value to the dietary supplement, beauty care skincare, and pharmaceutical industry, of the economic rights to his company and its innovations.  Fisher co-founded BioZone Laboratories, Inc. ("BZL" or "BioZone Laboratories"), located in Northern California since its inception in 1989.  As President of BZL, Fisher directed and helped to build the company over the course of the ensuing 22 years.  During that time, BioZone Laboratories engaged in the production of pharmaceuticals as a contract manufacturer for other companies in the biotechnology industry.  Using proceeds from its manufacturing activities, BioZone Laboratories also sought to improve the technology of its industry through research and development into innovative and more efficacious methods of drug delivery.  Through these activities, BioZone Laboratories developed and patented technologies which could be applied and combined with many different classes and types of pharmaceuticals, including those used within the generic pharmaceutical industry.

2.      Defendants, a group of predatory investors and insiders, utilized fraud and misrepresentations directed towards Fisher in connection with the purported purchase in June 2011 of 100% of the shares of BZL, including the de facto theft of all the shares held by majority shareholder Fisher.  The fraudulent devices utilized by the Defendants include: investing nothing while taking substantial and valuable assets; a fraudulent merger with a debt-ridden corporate shell; dishonest acquisitions of corporations owned by one or more of the so-called investors; fraudulently seizing control of the target acquisition before the "purchase" closed; stripping BZL of its assets; sending BZL income to the defendant investors; borrowing money in BZL's name;

1    and loading BZL with the debt of companies entrenched in the interest of the Defendants.  All of

2    these misdeeds were performed without paying any of the purchase price or honoring a single

3    promise made to the majority shareholder Fisher.

4    3.       In January 2011, Plaintiff Fisher met with a group of investors, the Defendant representing

5    itself as Brauser Honig Frost Group ("BHFG").  Over the course of the following six months, this

6    group of investors misled Plaintiff Fisher through an investment scheme designed to divest

7    Plaintiff of all of the economic rights and goodwill he had built through his company over the

8    course of the previous 22 years.  This calculated scheme, which stripped Plaintiff of his company

9    BioZone Laboratories, has now resulted in the designated agent-for-hire of the predatory

10   investors, Defendant Elliot Maza, controlling a new company, Defendant BioZone

11   Pharmaceuticals, Inc. ("BP").  In exchange for all of the shares of Plaintiff's company BioZone

12   Laboratories, Inc, Defendants promised Plaintiff Fisher, and agreed under a stock purchase

13   agreement to provide him with, more than six-million shares of Defendant BioZone

14   Pharmaceuticals, Inc.  In addition, Plaintiff was promised a key role in the newly-formed

15   investment vehicle of Defendant BP, a role which was putatively solidified by an employment

16   agreement.

17   4.       Plaintiff Fisher now finds himself a very brief time later, under the guise of various false

18   pretenses utilized by Defendants, stripped of his company, devoid of employment, and in

19   possession of not a single share of the agreed-upon more than six-million shares of the new

20   company, Defendant BP.  In the aftermath of Defendants' abuse of Plaintiff, Defendant BP has

21   turned out, quite obviously, to be an opportunistic investment vehicle appropriated by Defendants

22   at the expense of the value built up over decades by Plaintiff through his company.  In these

23   economic times, where we are compelled to rebuild the value destroyed by the collective and

24   undeterred actions of irresponsible, remorseless financiers, and the rubble left from their unfair,

25   sharp, and prolonged investment practices, it shocks the conscience and offends every notion of

26   common sense and decency to allow the behavior of Defendants to go unchecked, to the

27   detriment of our efforts to recover and progress.  This is not even investment; it is stealing.

28

5.      Plaintiff has, since the filing of the original Complaint in this matter, learned that the dishonest and fraudulent conduct of the Defendants is not unique and has been repeated in a pattern many times with other companies.  Plaintiff thereby asserts that the actions of the Defendants form an illegal enterprise under the federal Racketeering Influenced and Corrupt Organizations ("RICO") statute (18 U.S.C. § 1962).  Over the years, numerous other individuals, companies, and entities have been adversely affected by the indefensible practices of the Defendants.  These common tactics, when examined as a whole, as inflicted upon this diverse array of entities, reveal that Defendants are running an illegal enterprise actionable for civil liability under the federal RICO statute.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 as the plaintiff's claims arise under the laws of the United States, including: Section 10B of the Securities Exchange Act of 1934; 15 U.S.C. Sec. 78j and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5; and the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.

7.      This Court has supplemental jurisdiction over plaintiff's claims in this action arising under state law pursuant to 28 U.S.C. § 1367.

8.      This Court has personal jurisdiction over the foreign defendants because they have consented to personal jurisdiction in the State of California, because they have availed themselves of the protections of California law, and/or because they have purposely directed their relevant conduct toward and within the State of California.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because most of the events giving rise to the claims alleged herein occurred in this District, and a substantial portion of the property that is the subject of the action is situated in this District.

## INTRADISTRICT ASSIGNMENT

10.     Pursuant to Civil Local Rule 3-2(d), assignment to the San Francisco Division of the Northern District is appropriate in that a substantial part of the events and omissions giving rise to the damages in this action occurred in the county of Contra Costa, California.

**PARTIES**

11.     Plaintiff Daniel L. Fisher ("Fisher") is an individual resident in Contra Costa County, California.  In 1989, Fisher co-founded BioZone Laboratories, Inc., eventually locating the company in Pittsburg, California.  Fisher led BZL as President for 22 years, growing the company and lending BZL money at various times when BZL urgently needed funds to continue business.  Pursuant to properly-documented loans to BZL, approved by the BZL Board, Fisher lent in excess of $1,050,000 to BZL to keep the company viable in bad economic times.  At the time of the investor defendants' acquisition of BZL stock, Fisher owned 55% of BZL stock and 12% in options.  During his time as President of BZL, Fisher also purchased the building in which BZL operates its business.

12.     Defendant BioZone Pharmaceuticals, Inc., a Nevada corporation ("BP"), was created by the investor defendants in March 2011 before the acquisition of BZL shares closed, as the result of a "reverse merger" into a shell company called International Surf Resorts, Inc. which had just been acquired by defendant Roberto Prego-Novo and defendant Barry Honig using insider information concerning the pending acquisition of BioZone Laboratories by the so-called investors.  BP became a public company by reverse merger, and its stock was quickly and artificially inflated by defendants Honig, Brauser and Frost for a quick profit.  The shareholders of International Surf Resorts received 18.72% of BP stock.

13.     Defendant BioZone Laboratories, Inc ("BZL") is a California corporation which continues to operate in Pittsburg, Contra Costa County, California.  The primary business of BZL before its shares were acquired by the investor-defendants was the development, formulation and manufacture for third-parties of over-the-counter drugs and supplements pursuant to FDA monographs, cosmetics and cosmetic ingredients, and ethical (prescription) drugs.  BZL also licensed its proprietary and patented processes, primarily to customers.  At the time of the events related herein, BZL had two wholly-owned subsidiaries: Equalan Pharma LLC, which marketed Glyderm, a BZL product; and EquaChem LLC, which licensed BZL's proprietary and patented intellectual properties.  Both Equalan Pharma and EquaChem are California limited liability companies.  BZL also owned a 45% interest in BetaZone LLC, a pharmaceutical company.

14.     Defendant The Frost Group LLC ("Frost Group") is a Florida limited liability company with its principal place of business in Miami, Florida.  It is believed that the Frost Group includes Phillip Frost, Michael Brauser, Barry Honig, and Roberto Prego-Novo.

15.     Defendant Brauser Honig Frost Group ("BHFG" or the "Frost Brauser Honig entity") is an unregistered entity based in Miami, Florida, of unknown form, which purports to act as a group of investors, and which purportedly purchased 100% of BZL stock in June 2011.  Defendant Brauser Honig Frost Group never issued and never paid any stock to Plaintiff Fisher for his shares of BZL stock.  Brauser Honig Frost Group took over all of BZL operations in March 2011, long before the purchase transaction closed on June 30, 2011.  Defendants never paid for the stock or the assets of BZL, and were stripping BZL of its assets even before the sale transaction closed.  The Frost Brauser Honig entity "investors" also owned the various companies which were "acquired" by BP for inflated prices, and loaded BP with debt prior to, and in order to, place responsibility for that debt upon BZL.

16.     Defendant Phillip Frost ("Frost"), part of the Frost Brauser Honig entity, is an individual resident in Palm Beach County, Florida, and a ringleader of the investor group which took all of Fisher's BZL stock in June 2011 without paying for it.  Frost is a majority shareholder and operator of OPKO, Inc., which recently "acquired" BZL's valuable intellectual property without paying any money to BP.  As alleged below, Frost also has a long history of stock manipulation and dishonest takeovers of various companies throughout the United States.

17.     Defendant Michael Brauser ("Brauser), part of the Frost Brauser Honig entity, is: an individual resident in Broward County, Florida; an owner of Marlin Capital Partners, LLC a Florida limited liability company with Barry Honig; and a ringleader of the so-called investor group which took all of Fisher's BZL stock in June 2011 without paying for it.  Brauser has a long history of stock manipulation and dishonest takeovers of various companies throughout the United States, as alleged below.

18.     Defendant Barry Honig ("Honig") is: an individual resident of Palm Beach County, Florida; purportedly a securities trader and partner in Marlin with Brauser; and a ringleader of the investor group which took all of Fisher's BZL stock in June 2011 without paying for it.  Honig

was directly involved in the March 2011 artificial inflation of the value of the stock of the new public company BP, and he and other investor defendants, including Brauser, made a quick profit from the sale of worthless BP stock.  Honig was also directly involved in the "reverse merger" of BZL into the shell BP (previously International Surf Resorts), having purchased stock in the "shell" before the merger.  Honig also has a long history of stock manipulation and dishonest takeovers of various companies throughout the United States, as alleged below.

19.     Defendant Elliot Maza ("Maza") is an individual resident of Walnut Creek, California and Englewood Cliffs, New Jersey.  Maza holds himself forth as a lawyer and a Certified Public Accountant.  Unbeknownst at the time to Fisher or BZL before the purchase of BZL shares, Maza had long and complex relationships with the investor defendants and various of their acquisitions and frauds.  Maza was an integral part of the investor defendants' takeover of these companies, stripping assets and driving acquired companies into bankruptcy.  Before the purchase of BZL stock closed, Fisher and BZL were forced by the investor defendants to replace their outside counsel with Maza.  Maza acted as counsel for BZL and its shareholders until the purchase closed in June 2011.  In March 2011, Maza took over all operations of BZL, and the investor defendants appointed Maza as the CFO of BP.  Fisher was frozen out of management.

20.     Defendant Brian Keller ("Keller") is an individual resident in Antioch, Contra Costa County, California.  Keller co-founded BZL in 1989 with Fisher.  Over the years, Keller contributed less and less to BZL but continued to receive a salary and occasionally made sales presentations.  Keller refused to loan any of his own funds to BZL.    At the time of the defendants' acquisition of BZL stock, Keller owned 45% of BZL stock.  In early 2011, Keller set up BZL as a target for acquisition and conspired with the investor defendants to push Fisher out of BZL, and to cheat Fisher out of his 22 years of hard work.

21.     Defendant Roberto Prego-Novo ("Prego-Novo") is an individual of unknown residence who purchased International Surf Resorts, Inc. in order to profit from the "reverse merger" after the investor defendants changed the name of this entity to BioZone Pharmaceuticals, Inc., the shell company for the reverse merger.  Prego-Novo is a long-time Frost associate, and has been a part of several dishonest deals and stock manipulations involving the Frost Brauser Honig entity

and the Frost Group.  Prego-Novo not only received BP stock for the shell corporation, but he

was also appointed president of BZL by other defendants in March 2011, four months before the

investors purportedly purchased BZL.  Defendant Prego-Novo became President of BP as well as

President of another company "acquired" by BP in 2011.  Prego-Novo is also an executive of

OPKO, owned by Frost, which obtained BZL's intellectual property without payment.

22.     Does 1 through 150 are United States citizens whose identities, residences and

involvement in the investors' fraud are presently unknown.  Following discovery, it is anticipated

that some or all will be added as defendants.

23.     The individual investor defendants Frost, Brauser, Honig, Prego-Novo, and Does 1-50,

along with defendants Maza and Keller and Does 51-150, conspired to defraud Fisher, and in

doing the acts in furtherance of such conspiracy, ignored and disregarded all the bogus corporate

entities and limited liability companies with which they have surrounded themselves, including,

without limitation, defendant The Frost Group and its many related companies, defendant Brauser

Honig Frost Group and its many related companies, and defendant BP, which was created from

the entity formerly known as International Surf Resorts for the purposes of perpetrating the

fraudulent reverse merger.  The individual defendants also acted in their own personal profit-

based interests in defrauding Fisher and failing to uphold their corporate duties and legal

responsibilities.  The corporate forms were ignored and financial records were kept secret, with

numerous acquisitions as well as lending-based transactions occurring without adherence to

Board or shareholder procedures.

24.     The individual investor defendants formed BP and appointed Maza and Prego-Novo as

corporate officers for the purpose of obtaining Fisher's shares without payment for those shares,

and for the further purpose of denying Fisher any consideration for those shares.  At the same

time, the individual investor defendants looted BZL and exploited BZL.

25.     The individual defendants exercised such control and influence over BP and the other

entities, and failed to capitalize or operate BP as an ongoing company, such that the

corporate/limited liability forms should be eliminated in the interests of justice, and the individual

defendants held personally liable for their fraudulent conduct.

26.     All the defendants have acted as agents for one another and co-conspirators in connection with the wrongful acts alleged in this amended complaint; and the acts and statements by one are attributable to all.

**FACTS COMMON TO ALL CLAIMS FOR RELIEF**

27.     In late December 2010 and early January 2011, plaintiff Fisher was approached by defendant Keller to make a sales presentation to purported investors who were in a business similar to BioZone Laboratories, Inc.  Keller knew that Fisher wanted to sell his shares in BZL and recover the money he had put into BZL, relieving his personal finances and family from the burden of carrying BZL.  Keller persuaded Fisher to meet with these investors in Florida.

28.     Fisher is informed and believes that Keller made secret prior agreements with the Frost Group and the purported investors to take over BZL, oust Fisher and allow Keller to manage it.

29.     On January 10, 2011 Fisher and Keller traveled to Florida and made a presentation regarding BZL, its products, its intellectual property and its potential to defendants Frost, Prego-Novo, Brauser and Honig.  An extended intensive period of negotiations followed, eventually culminating in the execution of a Binding Letter of Intent on January 28, 2011.  The Binding Letter of Intent provided, among other things, that the BZL shareholders would have a 35% equity interest in the post-acquisition entity.  At this point, the BZL shareholders had their own outside counsel representing them.

30.     Financial information was provided by BZL, and the proposed investors undertook extensive due diligence, including on-site visits, detailed conference calls, review of BZL accounts receivable, accounts payable, inventory, loans including Fisher's loans to the company, licenses, obligations and customers.  Maza was heavily involved in every aspect of BZL's business and was reporting to Frost and Brauser constantly.  The investors' due diligence lasted through and after the eventual closing of the sale of BZL stock in June 2011.

31.     On February 22 and 23, 2011, defendants Frost el al. called an "all hands" meeting in Miami.  Frost insisted that BZL utilize a lawyer of his choice, introducing Maza to the BZL shareholders as the lawyer who would be advising them.  The meetings concerned the capitalization and financing needs of the future company.  All the Frost-related investors agreed

to raise funds to increase the capitalization, and it was agreed to amend the Letter of Intent to provide:

    a.    The Frost-related investors would raise not less than $8 million, which would be put into the new company upon the purchase of BZL stock.

    b.    In return for the infusion by the investor defendants of at least $8 million into the new company, it was agreed that the BZL shareholders would receive 48% of the new company.  Fisher's interest in the new company was to be 6,650,000 shares, worth $4.00 per share at the time;

    c.    Fisher and Keller would each receive $100,000 upon closing of the sale transaction;

    d.    Fisher was to be employed by the new company for 3 years at an annual salary of $200,000;

    e.    Fisher's loans to BZL totaling in excess of $1,050,000 would be repaid to Fisher;

    f.    The new company would continue to pay rent on the BZL facility.

32.    Following the Amended Binding Letter of Intent, the investor defendants forced an early transition from BZL to the new company and on March 1, 2011 appointed defendat Maza as Chief Financial Officer and General Counsel for BZ, and defendant Prego-Novo as President of BZL.  Maza took over management of all operations and all BZL financial management, although the stock purchase had not closed and would not close for another 4 months.  All financial records were removed from BZL and transferred to Englewood Cliffs, New Jersey, ostensible headquarters of BP.  Plaintiff Fisher was pushed out of management of the company.  In the following four months, Maza engaged in a systematic process to take over the core business of BZL:  all business concerning BZL's contract manufacturing, marketing, customers, and the operations of the subsidiaries Equalan and EquaChem were totally controlled by Maza, who had no experience regarding, and knew nothing about, the BZL business.  Crucial employees were fired, and valuable patents and licenses were handed out to parties related to the investors (such as OPKO Health, owned by defendant Frost).

33.     The investor defendants proceeded to create a new public company, a Nevada corporation to be known as BioZone Pharmaceuticals, Inc. ("BP") by renaming a supposedly "clean shell" International Surf Resorts, Inc.  As noted above, this "shell" was not clean but had over $2 million undisclosed debt which was loaded into BP.  The shell company received 18.72% of the stock of BP; despite requests, Fisher has never been provided with any documents relating to the "reverse merger" or the payments to Honig and Prego-Novo.  Brauser and Honig began to market the stock of the new company BP, artificially inflating the value with misrepresentations, believed to be a "pump and dump" maneuver.  All revenue from the sale of BP stock was kept by the investor defendants.

34.     Defendant BP "acquired" another company on May 16, 2011, owned by the investor defendants, known as Aero Pharmaceuticals, Inc., which also owned another Frost-related company, Baker Cummins.   Fisher was told nothing about these transactions, which resulted in grants to Aero of 12.43% of BP stock.  As a result of the International Surf manipulations and the Aero "acquisition," the BZL shareholder equity in the new company was diluted to 9.92%.

35.     On or about June 30, 2011, the stock purchase transaction closed, and the Stock Purchase Agreement was filed with the SEC, including the defendants' promises to raise and invest $8 million into the new company and to issue 6,650,000 shares to Fisher with 20% in escrow until 5 days after closing.

36.     Despite repeated requests, very few of the closing documents were provided to Fisher. They never been provided to Fisher in their entirety.  The documents that were provided were purported to be in The Frost Group's lawyer's office, as Maza claimed he did not keep a copy of the documents. Financial information, such as the monthly balance sheet and P&L reports, has never been provided.  The only information about the company came from SEC filings on BP, which were inconsistent and usually false.  Fisher repeatedly requested BP's strategic plan, business plans, and plans for raising the promised $8 million.  Maza unilaterally announced that Fisher's salary would be cut from the promised $200,000 to $110,000.

37.     To date, Fisher has not received a single share of stock in BP and does not believe that any such stock was ever issued.

38.     Two months after the closing, Maza began fabricating reasons for BP's refusal  to provide the consideration owed to Fisher for the transfer of his BZL stock to the investors and to BP, such as  no money, no repayment of his loans to BZL, and no stock. Maza fabricated reasons why Fisher should not be repaid the money Fisher had loaned to BZL from his personal funds to BZL. Maza fabricated reasons why Fisher was to be frozen out from all management of BP. Accusations of dishonesty and nondisclosure were repeatedly leveled at Fisher, without factual basis.

39.     By September 2011, Maza had been appointed President and Chief Executive Officer of BP.  Employees were fired.  Assets were sold or given away.  Long-time BZL customers had become disenchanted with the new company and its inability to meet their needs, and were leaving for other contract manufacturers.

40.     Fisher became aware of the plans of the Maza-Frost cabal with regard to: inflating the stock price of BP with SEC filings full of misrepresentations of the financial status of the company; acquisitions and sales of BZL's intellectual property; selling off the stock, keeping the proceeds, and then petitioning for bankruptcy.  Fisher noted that the material being filed with the SEC, in efforts to pump up the stock price, was not true and that the market and investors were not getting truthful information.  Fisher repeatedly asked Maza and others for information about the operating and accounting practices and financial condition of BP, but was rebutted;  when Maza, et al. held Board meetings, Fisher was excluded in violation of the company's by-laws. Despite having a physical location in Pittsburg, California, where co-founder Fisher built the original company over more than two decades, Maza sequestered all the BP financial information in New Jersey.

41.     On December 8, 2011, in an effort to alert the SEC and the market of the investor defendants' illegal securities-based activities, Fisher filed a whistleblower complaint with the SEC containing information relating to violations of federal securities laws perpetrated by the Frost-related investors and Maza.  The SEC whistleblower complaint was submitted via the SEC's internet-based whistleblower system.

42.     The SEC complaint details several securities-law violations, including ongoing violations of Section 10b of the 1934 Securities and Exchange Act and rule 10b-5.

43.     As a direct result of Fisher's oft-expressed concerns to the defendants regarding the mismanagement of the public company BP, the absolute breach of the Stock Purchase Agreement, and the routine violation of stock exchange and SEC regulations express in the SEC complaint, on February 3, 2012, Maza terminated Fisher's employment by e-mail, effective January 30, 2012.

44.     Defendants have continued to loot and destroy the company which they took from Fisher, and to mask their looting with releases and SEC filings which paint a false financially rosy picture of licensing by, and investment into, BP by various Frost-related entities and other insiders. In truth, BP is barely operating.

**FACTS RELATED TO RICO ACT CLAIMS**

45.     Defendant Brauser Honig Frost Group, Defendant The Frost Group, Defendant Frost, Defendant Brauser, and Defendant Honig have engaged in a pattern of activity designed to defraud and harm numerous people and companies in a similar manner that Plaintiff Fisher was fraudulently divested of his company.

46.     Defendants Frost, Honig, Brauser, The Frost Group, and the Brauser Honig Frost Group have "invested" together in numerous companies such as, without limitation, ChromaDex Corporation, Money4Gold Holdings Inc., usell.com, Inc. (formerly known as Upstream Worldwide, Inc.), and PassPort Potash Inc.  They are familiar with each other and have acted in concert in their fraudulent and purportedly investment-related behavior inflicted upon a diverse array of entities and individuals.

47.     Defendants have operated, and continue to operate, their activities from  a common location.  In a recent SEC filing made by Vringo, Inc. on June 21, 2012, the addresses of Frost Gamma Investment Trust (one of the purported "investment" entities of Defendant Frost) and Defendant Honig are both identical to the address of Defendant Brauser Honig Frost Group.

48.     Many people and entities have been targeted and harmed by Defendants in a similar manner in which Fisher was targeted and harmed.  Several of the many instances of Defendants'

harmful investment-related activities involve the following entities: Ben Franklin Technology Partners of Southeastern Pennsylvania; interclick Inc.; Sunair Services Corporation; SendTec, Inc. (formerly known as "RelationServe Media, Inc."); Homebridge Mortgage Bankers Corporation; Tube Media Corporation; and Sagebrush Gold Ltd.  All of these entities are or have been the subject of litigation involving the Defendants' investment practices.

### ***Ben Franklin Technology Partners of Southeastern Pennsylvania***

49.     On November 2, 2007, Ben Franklin Technology Partners of Southeastern Pennsylvania ("BFTP-SEP"), commenced federal civil litigation (the "Ben Franklin Litigation") against Opko Health, Inc. ("Opko Health"), Opko Ophthalmologics, LLC ("Opko Ophthalmologics"), and Acuity Pharmceuticals, LLC ("New Acuity"), in the District Court for the Eastern District of Pennsylvania (Case No. 2:2007-cv-04612).

50.     Defendant Opko Ophthalmologics is the successor by merger to defendant Acuity Pharmaceuticals, Inc.

51.     The address for the principal place of business for defendant Opko Ophthalmologics is 4400 Biscayne Blvd., Miami, FL 33137, which is identical to the address of several of the individual defendants and defendant-entities in the present litigation.

52.     Upon information and belief, defendants Brauser and Honig of the current litigation are business partners with the principals of defendant Opko Health of the Ben Franklin Litigation.

53.     Upon information and belief, Brauser and Honig were involved in the transactions which are the subject of the actionable behavior giving rise to the Ben Franklin Litigation.

54.     Defendant Frost of the current litigation was a member of the Opko Health management team at the time of events resulting in the Ben Franklin Litigation.  Frost remains a member of the Opko Health management team, and sits on the Board of Directors of Opko Health.

55.     In its complaint, BFTP-SEP sought equitable relief for breach of contract and a declaratory judgment that BFTP-SEP was "entitled to receive warrants to purchase an additional 259,472 shares of Opko Health," as well as costs and other equitable relief.

56.     Opko Health currently owns all of the outstanding interest in Opko Ophthalmologics.

57.     Upon information and belief, BFTP-SEP's claim in the Ben Franklin Litigation is based upon the non-honored execution of a warrant agreement, by Acuity Pharmaceuticals, Inc. ("Acuity"), which obligated Acuity to issue to BFTP-SEP warrants to purchase additional shares of Acuity stock, if Acuity merged with an entity headquartered outside of Pennsylvania.

58.     In March, 2007, Acuity merged with an entity headquartered outside of Pennsylvania, thereby triggering the warrant agreement.

59.     On or around March 27, 2007, a merger was completed by and between Acuity, Opko Ophthalmologics, and Froptix Corporation. By virtue of the merger, Opko Ophthalmologics was the successor to the legal obligations of Acuity, including the obligation of the warrant agreement.

60.     BFTP-SEP brought forth the action because Opko Ophthalmologics failed to comply with the terms of the warrant agreement.

### ***Interclick Inc.***

61.     On November 21, 2011, John Parker commenced a class action lawsuit (the "Interclick Litigation") on behalf of the public stockholders of interclick Inc. ("Interclick"), against Interclick's Board of Directors for breaches of fiduciary duties arising out of their attempt to sell the Company to Yahoo! Inc. ("Yahoo").

62.     Defendant Brauser of the current litigation was Co-Chairman of the Board of Interclick beginning in August 2007.  Upon information and belief, at the time of the November 2011 sale of Interclick to Yahoo, Defendant Brauser was still Co-Chairman of the Board of Interclick.

63.     Defendant Honig of the current litigation was Co-Chairman of the Board of Interclick beginning in August 2007.  Upon information and belief, at the time of the November 2011 sale of Interclick to Yahoo, Honig was still Co-Chairman of the Board of Interclick.

64.     Interclick was a technology company providing solutions for data-driven advertising. The Company's proprietary Open Segment Manager ("OSM") platform organizes and valuates billions of data points daily to construct the most responsive digital audiences for major digital marketers. On November 1, 2011, Interclick and Yahoo announced an agreement under which Yahoo, through its wholly owned subsidiary, Innsbruck Acquisition Corp. ("Merger Sub"), would

commence a tender offer to acquire all of the outstanding shares of Interclick in an all-cash transaction at $9.00 per share (the "Proposed Transaction"). The Proposed Transaction was valued at $270 million. Yahoo commenced the tender offer on November 15, 2011, and it was scheduled to expire December 13, 2011.

65.     As related in the Interclick Litigation, the Proposed Transaction is unfair to Interclick shareholders, does not offer them adequate consideration, and is going to be effected through the dissemination of a materially false and misleading recommendation statement, as demonstrated by the Schedule 14D-9 Recommendation Statement filed by Interclick on November 15, 2011 (the "Recommendation Statement").

66.     The plaintiff in the Interclick Litigation alleges that the Board of Interclick breached its fiduciary duties by agreeing to the Proposed Transaction for grossly inadequate consideration. As described in more detail below, the plaintiffs in the Interclick Litigation alleged that given Interclick's recent strong performance as well as its future growth prospects, when considered alongside the synergies Yahoo was to receive in the Proposed Transaction, the consideration shareholders were originally to receive was inadequate and undervalued the Company.

67.     The defendants in the Interclick Litigation allegedly exacerbated their breaches of fiduciary duty by agreeing to secure the Proposed Transaction with deal-protection devices that precluded other bidders from making a successful competing offer for Interclick. Specifically, pursuant to the merger agreement dated October 31, 2011 (the "Merger Agreement"), the Interclick Litigation defendants agreed to: (i) a strict no-solicitation provision that prevented Interclick from soliciting other potential acquirers or from continuing discussions and negotiations with potential acquirers; (ii) a provision that provided Yahoo with 4 business days to match any competing proposal in the event one was made; and (iii) a provision that required Interclick to pay Yahoo a termination fee of $9 million in order to enter into a transaction with a superior bidder.

68.     According to the plaintiff in the Interclick Litigation, these provisions substantially and improperly limited the Interclick Board's ability to act with respect to investigating and pursuing superior proposals and alternatives including a sale of all or part of interclick.

69.     The Interclick Litigation maintains that, instead of acting in the best interests of the shareholders of Interclick, the Board of Interclick, led by Defendants of the current litigation, Brauser and Honig, the Co-Chairmen of the Interclick Board of Directors, pursued, recommended, and agreed to an ill-advised Proposed Transaction because of their personal self-interest, and the personal interest of other Interclick insiders in the deal.  As a result, the shareholders of Interclick were adversely harmed.

70.     Upon information and belief, as members of Interclick's management, Brauser and Honig entered into lucrative employment agreements with Yahoo, ensuring their employment with Yahoo following consummation of the Proposed Transaction.

71.     As alleged in the Interclick Litigation, the Interclick Board of Directors, led by Defendants Brauser and Honig, recommended that their shareholders tender their shares while issuing the false and misleading Recommendation Statement filed on November 15, 2011.  The Recommendation Statement failed to disclose material information, concerning, among other items: (a) the interests of Interclick's executive officers and directors in the Proposed Transaction; (b) the selection, role, and interests of Interclick's financial advisors; (c) the sales process conducted by the Board of Interclick; and (d) the financial analyses conducted by GCA Savvian Advisors, LLC ("GCA Savvian"), Interclick's financial advisor that conducted a fairness opinion.

72.     Upon information and belief, the individual Interclick defendants, led by Brauser and Honig, breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing to Interclick, thereby securing considerable investment-based gains for themselves at the expense of the majority of their company's shareholders.

### ***Sunair Services Corporation***

73.     On March 12, 2009, Plaintiff Sunair Services Corporation commenced federal civil litigation (the "Sunair Litigation") against defendants including Brauser and Honig of the current litigation in District Court for the Southern District of Florida (Case No. 09-cv-80417).

74.     The relief sought by Plaintiff Sunair Services Corporation ("Sunair") was for temporary and permanent injunctive relief against the defendants in connection with violations of federal securities laws.

75.     Defendant Michael Brauser was a shareholder of Sunair.

76.     Defendant Barry Honig was a shareholder of Sunair.

77.     Upon information and belief, Brauser and Honig acted in concert with respect to their strategy for Sunair, which led to the securities litigation.

78.     The action alleged that the defendants acted as agents for one another and co-conspirators in connection with the wrongful acts detailed in the lawsuit.

79.     On January 28, 2009, Sunair filed a proxy statement with the United States Securities and Exchange Commission ("SEC"), pursuant to Section 14(a) of the 1934 Exchange Act, in connection with its annual shareholders meeting to elect seven members of its Board of Directors.

80.     On February 2, 2009, defendants in the Sunair Litigation, including Brauser, filed a Schedule 14C Information Statement with the SEC. In this Schedule 14C Information Statement, the defendants claimed to have executed consents for more than 50 percent of the outstanding shares of Sunair, and indicated that Sunair's current directors would be removed and replaced with defendants which included Brauser.

81.     From February 25, 2009 through March 9, 2009, defendants, including Brauser, filed Amendment Nos. 1–3 to the Schedule 14C Information Statement.

82.     Under Amendment No. 3, Brauser stated that the certain persons orally agreed to sign written consents to replace the entire Board of Directors with defendants which included Brauser.

83.     Upon information and belief, the defendants in the Sunair Litigation failed and refused to file a preliminary or definitive written proxy statement, containing the information specified in Schedule 14(a) as required by SEC rules and regulations. The defendants in the Sunair Litigation unlawfully solicited proxies from shareholders of Sunair, without providing the requisite disclosures.

84.     The plaintiffs in the Sunair Litigation accused Brauser of making false and misleading statement of material fact in the solicitation of these proxies in violation of SEC Rules 14a-9 and 14c-6.

85.     Additionally, the plaintiffs in the Sunair Litigation accused Brauser of conspiracy with other defendants and unspecified persons in violating federal securities laws, including recruiting and encouraging others to violate Section 14A and the rules regulating proxy solicitations.

86.     Upon information and belief, Brauser filed Schedule 14C Information Statement and Amendment Nos. 1-3, which contain false and misleading statements concerning Sunair.

87.     Upon information and belief, through the use of telephonic communication, the defendants in the Sunair Litigation, including Brauser, solicited shareholders of Sunair to provide proxies to them in connection with the removal of the then-present Board of Directors of Sunair.

88.     Upon information and belief, the defendants in the Sunair Litigation, including Brauser, listed in Amendment No. 3 expected to benefit from the proposed replacement of the directors.

89.     Upon information and belief, in order to falsely mask the illegal proxy solicitation, defendant Brauser, in Amendment Nos. 1-3, denied that he had engaged in proxy solicitation when he knew that such assertion was false. The evidence of this false assertion is found in Amendment Nos. 2 and 3.

90.     Upon information and belief, in Schedule 14C and Amendment Nos. 1-3, Brauser made false representations of fact and omitted material facts regarding himself.

91.     Upon information and belief, Brauser failed to disclose his history of prior lawsuits wherein he had been named as a defendant to the plaintiff in the Sunair Litigation.  These lawsuits include civil fraud litigation filed against him relating to his involvement with various public companies, a bankruptcy involving a company owned by Brauser, and various alleged violations of SEC rules. The false representations and omitted material facts underlying the Sunair Litigation are reflective of past actionable investment-related practices of Brauser. Defendant Brauser has been the subject of civil fraud-based litigation related to his involvement with various public companies.  Numerous violations of SEC rules by Brauser have been alleged and supported in the evidentiary record by Sunair and other entities.

92.     Furthermore, Brauser failed to disclose that Equifax sued Brauser for fraud and breach of contract in *Equifax, Inc. v. Michael Brauser*, case no. 04-80754 (S.D. Fla. 2004).

93.     In federal fraud litigation, Equifax alleged that in order to induce Equifax to enter into a merger with Naviant, Brauser (a) hid low-priced "CPM" (Cost Per Thousand) email transaction in order to inflate Naviant's effective CPM rate, (b) maintained one set of books for Naviant that was more accurate and complete and another set of books that omitted the low-prices email transaction, which Naviant provided to Equifax and its accountants during merger negotiations, (c) misrepresented the volume and price of transactions that accounted for a large percentage of Naviant's pre-acquisition revenue, and (d) engaged in fictitious transactions with other email marketing companies to inflate Naviant's financial performance.

94.     Brauser failed to disclose that the federal fraud litigation was settled in exchange for, among other things, the payment to Equifax of the remaining amounts that remained in a $10 million dollar Escrow Fund that was set aside as security for the indemnification obligations of the selling shareholders of Naviant at the time of the merger agreement with Equifax, as alleged in the litigation.

95.     Upon information and belief, Brauser also failed to disclose that, after the federal fraud litigation, Softbank Capital Partners, a Naviant shareholder, sued Brauser on March 24, 2008 for breach of contract and indemnification for Brauser's failure to pay Softbank its share of the millions of dollars of attorney's fees and costs incurred by Softbank in its capacity as the shareholders representative of Naviant. Softbank claimed that Brauser had been "intimately involved in carrying out various frauds at Naviant and covering up their misdeeds through threats and intimidation."

### *SendTec, Inc.*

96.     On August, 28 2006, the plaintiffs Richard Thompson and L. Alan Jacoby commenced a class action suit (the "SendTec Litigation") against defendant Brauser of the current litigation, SendTec, Inc. ("SendTec"), formerly known as RelationServe Media, Inc. ("RelationServe").

97.     Upon information and belief, Brauser was RelationServe's Chairman of the Board from October 31, 2005 until September 7, 2006.

98.     Upon information and belief, Brauser worked with his colleagues, defendants Frost and Honig of the current litigation, with respect to business-related activities of RelationServe and SendTec which gave rise to the SendTec Litigation.

99.     RelationServe changed its name to SendTec, Inc. on July 26, 2006, while Brauser was Chairman of the Board, and prior to the filing of the SendTec Litigation.

100.    In the Second Amended Class Action Complaint, the plaintiffs in the SendTec Litigation allege that the defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Act") and Rule 10b-5 promulgated under the Act.

101.    The basis of the alleged 10(b) and 10b-5 violations rest in part on the following courses of conduct:

      a.      The selling of securities through persons who were not registered as broker/dealers with the SEC, California, Connecticut, Florida, Illinois, Indiana, Nevada, New Jersey, New York, Ohio, or Pennsylvania, and were not affiliated as an agent or representative of a registered broker/dealer;

      b.      failing to alert the investing public that RelationServe had sold securities through unregistered broker/dealers, which exposed RelationServe to substantial contingent claims of rescission, and civil and criminal liability; and, by failing to alert the investing public that director Warren Musser ("Musser"), had been sued by stockholders of SafeGuard Scientifics, Inc. and TyCom, Ltd., for securities violations.

102.    Upon information and belief, Brauser signed one or more certifications pursuant to the Sarbanes-Oxley Act that impermissibly omitted material facts in relation to the alleged violations.

103.    The defendants in the SendTec Litigation, by virtue of their high-level positions in the company then-known as RelationServe, directly participated in the management of RelationServe, were directly involved in RelationServe's day-to-day operations at the highest levels, and were privy to proprietary information concerning RelationServe and its business operations and financial conditions, according to the allegations in the SendTec Litigation.

104.    Upon information and belief, the defendants in the SendTec Litigation, including Brauser of the current litigation, were involved in the drafting, producing, reviewing, and/or dissemination of misleading statements and were aware of the fact that misleading statements were being issued and approved or ratified these statements in violation of federal securities law.

105.    Each of the defendants in the SendTec litigation, including Brauser, possessed a duty to disseminate prompt and accurate information with respect to RelationServe's earnings, management, and contingent civil and criminal liabilities.  Each of the defendants was also under a duty to correct any previously-issued misleading statements so that the price of RelationServe's securities would be based upon truthful and accurate information.

106.    The defendants of the SendTec Litigation, including Brauser, failed to uphold their duties to SendTec, to the shareholders of SendTec, and to the public, as alleged in the SendTec Litigation.

107.    Upon information and belief, Brauser, Honig, and Frost participated in a scheme that defrauded purchasers of RelationServe securities by disseminating materially misleading statements to the public and concealing material adverse facts from the public concerning securities and shares of RelationServe.

### *Homebridge Mortgage Bankers Corporation*

108.    On October 17, 2006, Homebridge Mortgage Bankers Corporation ("Homebridge") brought a civil action (the "Homebridge Litigation") against defendant Brauser of the current litigation, Vantage Capital Corporation ("Vantage") and Scott Harris ("Harris") in the Southern District of New York (Case No. 06-cv-9465).

109.    Brauser is President of Vantage.

110.    Upon information and belief, Brauser worked with colleagues and defendants Frost and Honig of the current litigation with respect to business-related activities of Vantage which gave rise to the Homebridge Litigation.

111.    Homebridge alleged: (1) breach of a settlement and purchase agreement; (2) aiding and abetting Harris' breach of his fiduciary duty of loyalty by Vantage and Brauser; (3) tortious interference by the defendants with Homebridge's business relationships with its employees; (4)

violation by the defendants of Florida law by misappropriating Homebridge's confidential information.

112.    As related in the Homebridge Litigation, a branch office of Homebridge was located in Deerfield Beach, Florida. Homebridge devoted substantial monetary and management-based resources to the development of this office. By August 2006, the branch had grown to 55 employees, including approximately 38 loan officers.

113.    In late August 2006, Homebridge learned that Brauser and other high-ranking employees at the Florida branch were engaged in actions designed to damage Homebridge.  These actions included persuading Homebridge employees at the Florida branch to resign and commence work at an entity owned or controlled by Brauser or another defendant.

114.    Upon learning of the efforts by Brauser to damage Homebridge, Homebridge confronted the defendants and threatened suit.  Litigation at that point was avoided by an agreement signed by Brauser and other defendants.

115.    Pursuant to the agreement signed by the parties to the Homebridge Litigation, the parties released any claims against each other conditioned upon Homebridge receiving all payments required by the agreement.  By the terms of the agreement, Vantage was to pay Homebridge $1.2 million, plus an additional $39,000 related to security deposits for the assumption of various liabilities, including a sublease to the office of Homebridge's Florida branch, and certain equipment leases starting on September 1, 2006.  The assignment of the Florida branch office was made pursuant to Vantage and \Brauser agreeing to indemnify Homebridge for any liabilities related to the office sublease and equipment leases.  Additionally, Brauser agreed to indemnify Homebridge for any failure of Vantage to make the foregoing payments.  Brauser personally guaranteed "the performance, payment, indemnification and other financial obligations of Vantage."

116.    In exchange for the payments, the assumption of liabilities, indemnifications and the personal guaranty, Homebridge agreed to assign to Vantage all rights, title and interest in certain assets associated with the Homebridge branch office located in Deerfield Beach, Florida. Under the agreement, Vantage assumed, effective September 1, 2006, all ongoing liabilities related to

such assets, including the liability to make sublease payments for the office. The sublessor and the primary landlord of the Florida branch office agreed to the assignment of the office sublease.

117.    An initial payment was made by Vantage of $400,000.  The remaining portion of the $1.2 million settlement amount per the terms of the agreement was allegedly to be paid each month starting on October 8, 2006 in $200,000 increments. However, the payments for the remaining $800,000 were allegedly never made by Vantage. Additionally, the payment for the security deposits for the office sublease and certain equipment leases were also allegedly never paid by Vantage.

118.    In addition to failing to make the required payments under the agreement, Brauser, President of Defendant Vantage, failed to make payments to the primary landlord pursuant to the office sublease.  Homebridge was subsequently compelled to pay the rent in order to avoid a default.

119.    Upon information and belief, Brauser failed to honor his indemnification and personal guaranty obligations to Homebridge.

120.    Furthermore, in the Homebridge Litigation, Homebridge alleged that Brauser and another defendant had encouraged former Homebridge personnel to bring a class action against Homebridge.

121.    According to the complaint in the Homebridge Litigation, Brauser continued efforts to solicit Homebridge employees in violation of the agreement.

122.    With the aid of Brauser who upon information and belief was advised by and colluding with other defendants in the current litigation, the defendants in the Homebridge Litigation orchestrated a mass resignation of Homebridge's employees in an undue and actionable attempt to gain control of Homebridge's Florida-based business.

123.    The Homebridge Litigation was brought forth against Brauser and the other named defendants due to their failure to honor contractual commitments and engage is ethical investment-based practices.  Upon information and belief, acting in concert with and under the advisement of other defendants in the current Litigation, Brauser, along with his partners Honig and Frost, perpetuated a pattern of investment-based practices predicated upon violating the terms

of agreements, obtaining assets without paying the requisite consideration, and making repeated misrepresentations and omissions to the financial detriment of various entities, shareholders, and the public.

### ***Tube Media Corporation***

124.    On September 19, 2007, shareholders of Tube Media Corporation ("Tube Media") brought a class action lawsuit against Tube Media and its senior officers and spokespersons.

125.    Defendants in the current litigation Brauser and Honig are significant investors in Tube Media and each provided substantial loans to Tube Media.

126.    Upon information and belief, Brauser and Honig participated materially in advising Tube Media during the periods covered by the class action complaint.

127.    Tube Media was formerly known as AGU Entertainment Corp., and was incorporated in 2003 and changed its name to The Tube Media Corporation in February 2006. Tube Media is headquartered in Fort Lauderdale, Florida.

128.    The plaintiffs brought two counts against the defendants alleging: 1) violation of section 10(b) of the Exchange Act and Rule 10b-5(b) and 2) violation of section 20(a) of the Exchange Act.

129.    The basis for the alleged violation rested on failure to remit payroll taxes and for Tube Media's unreported compensation expense.

130.    The Tube Media plaintiffs alleged that the defendants filed a Form 10-QSB that contained materially false and misleading statements. The basis for this claim was the failure of the defendants to remit payroll taxes during the 2004 and 2005 tax period. The failure to remit these taxes was concealed from investors until May 2006, when Tube Media filed its 2005 Form 10-KSB with the SEC.

131.    On December 9, 2005, Tube Media filed its Form 10-QSB for the period ended September 30, 2005. The September 30, 2005 Form 10-QSB made materially false and misleading statements, omitting the failure of the Tube Media defendants to remit the payroll taxes.

132.    On March 1, 2006, the Company filed a Form 8-K which contained false and misleading statements due to the omission of failure to remit the payroll taxes.

133.     Tube Media filed Form 8-K on April 26, 2006 without including any disclosure schedules. The foregoing statement was false and misleading for omission of the unremitted payroll taxes.

134.     On May 11, 2006, after the market closed, Tube Media filed a Form 10-KSB. The filing disclosed that the unpaid taxes, including the estimated interest and penalties, aggregated to $353,472, an amount nearly equal to the $360,503 in revenue generated by the Company for the 2005 calendar year.

135.     On June 21, 2006, Tube Media filed an amendment to its previously issued Form 10-QSB. It stated in relevant part, "The Company has restated its previously issued March 31, 2005 condensed consolidated financial statements for . . . the issuance of stock to a former director in connection with an employment agreement."  The adjustment resulted in a $1,047,840 adjustment to reflect additional "compensation expense."

136.     The Tube Media plaintiffs alleged that the above statement was materially false and misleading because Tube Media did not have the skilled staff required to prepare the Form 10-QSB, that is, employees able to identify and address the issues regarding the material internal control deficiencies over financial closing, and to perform the review and analysis required for the proper filing of the Form 10-QSB.

137.     Upon information and belief, Brauser and Honig provided consulting services in connection with Tube Media's financial accounting and public disclosure practices.

138.     Prior to Tube Media's disclosure of information relating to the unremitted payroll taxes, its stock price was $2.16.  On November 24, 2006, after disclosure, Tube Media's stock price plummeted $0.58, a drop of 73%, due allegedly to the actions and schemes of Brauser and Honig.

### *SageBrush Gold Ltd.*

139.     On March 7, 2011, Shannon Briggs, a professional heavyweight boxer, filed suit against Barry Honig of the present litigation, Gregory Cohen ("Cohen"), Shelly Finkel ("Finkel"), The Empire Sports and Entertainment Company ("The Empire"), and The Empire Sports and Entertainment Holdings Company ("Empire Holdings") for breach of fiduciary duty, conversion, unjust enrichment and for breach of contract ("The Empire Sports Litigation").

140.    Shannon Briggs ("Briggs") and Cohen allegedly formed Golden Empire, LLC a New Jersey limited liability company ("Golden Empire").

141.    Starting on November 30, 2009, Briggs received sums for services provided to Golden Empire, and later The Empire, which he believed was his salary for those services.  Briggs and Cohen agreed that Briggs, in addition to those service, would resume his professional boxing career with Golden Empire as his promoter.

142.    Honig became an investor in Golden Empire, upon information and belief, sometime in January 2010.  Cohen assured Briggs that Honig's investment would benefit Golden Empire, by allowing "Golden Empire to continue to pay salaries to Briggs and others to advance Golden Empire's business interests."

143.    On February 10, 2010, Honig and Cohen incorporated The Empire as successor to the business of Golden Empire.  This merger transferred all of Golden Empire's assets and liabilities to The Empire, and "Empire assumed all assets, liabilities and promotional rights agreements entered into by Golden Empire, including the promotional agreement with Briggs."

144.    Upon information and belief, Honig and Cohen effected this merger without the knowledge or consent of Briggs, whose consent was required since Briggs was a 50% owner in Golden Empire.

145.    On September 29, 2010, the original directors and offices of Empire Holdings resigned. Thereafter, Honig and other became the new officers and directors of Empire Holdings.

146.    Upon information and belief, Cohen, on behalf of Finkel, Honig, The Empire, and Empire Holdings, promised Briggs a purse of $500,000 plus $50,000 training expenses plus $200,000 in additional compensation to participate in the bout against Klitschko on October 16, 2010. Briggs agreed to participate in the bout in reliance on that promise.

147.    Klitschko defeated Briggs in a twelve-round bout that left Briggs hospitalized for twelve days.

148.    Upon information and belief, following the bout with Klitschko, the Honig and the other defendants denied that they had agreed to pay Briggs $750,000 for the bout.  As a result of the actions of Honig and the other defendants, Briggs, a highly-ranked heavyweight boxer, was paid a

mere $25,000 for a fight at the highest caliber of the heavyweight division, against another highly-ranked opponent, and which left Briggs hospitalized for almost two weeks.

149.    Following the fight with Klitschko, Honig and the other defendants terminated Briggs' promotional agreement.

150.    Honig and the other defendants allegedly denied Briggs the compensation he was entitled to for his services to Golden Empire, The Empire and Empire Holdings.

151.    Through the manipulative use of successor corporations, Honig and the other defendants allegedly sought to dilute and diminish Briggs' ownership interest that he originally had in Golden Empire.

152.    As of September 29, 2010, Empire Sports and Entertainment Company acquired Excel Global in a reverse merger transaction.

153.    On June 1, 2011, Empire Sports and Entertainment Holdings Co. ("Empire Holding") announced that the Company had changed its name to Sagebrush Gold Ltd ("Sagebrush Gold" or "Sagebrush").  By March 31, 2011, Empire Holding's common stock had begun trading under a new symbol, "SAGE," on the OTC Bulletin Board.

154.    Upon information and belief, the name change was supposedly done to reflect Empire Holding's expansion of its business model to include resource exploration and production, primarily focusing on gold exploration.  At the same time, the company set forth to the public its intention to continue, through its subsidiary, Empire Sports & Entertainment Co., its current sports and entertainment businesses.

155.    Honig was Sagebrush Gold's Co-Chairman at the time of these reverse-merger and public-trading transactions.

156.    Phillip Frost, a defendant in the current litigation, through one of his investment entities, invested $9.3 million in offerings of subordinated debt and convertible preferred stock for Sagebrush.  Sagebrush held forth to the public that Frost's involvement with Sagebrush would assist efforts to attract the funding needed to complete multiple phases of its exploration program and to acquire strategic properties.

157.    Frost's investment in Sagebrush was executed through Frost Gamma Investments Trust, in which Frost is a Trustee.

158.    Upon information and belief, Sagebrush Gold was being touted (i.e. "pumped") by both Shazam Stocks and Mining Stock Alerts.  Upon information and belief, Shazam received $110,000 and Mining Stock Alerts received $25,000 in compensation for these statements.

159.    For the first nine months of 2011, Sagebrush Gold reflected losses of $93,170,078. Of that amount, $72,397,654 reflects a goodwill write-down, leaving Sagebrush with operational losses of over $20 million dollars.

160.    On February 7, 2012, Relief Gold Group, Inc. brought forth federal civil litigation against Honig, Sagebrush and other defendants in the District Court for the Southern District of New York. Relief Gold alleges various causes of action including breach of contract, intentional interference with contract, intentional interference with prospective business relationship/economic relations, misappropriation of trade secrets and unjust enrichment, related to the Company's acquisition on August 30, 2011 of the assets of the Relief Canyon Mine pursuant to Chapter 11 of the Bankruptcy Code.

161.    On February 27, 2012, Sagebrush Gold changed its name to "Pershing Gold Corporation."

162.    On September 21, 2012, Relief Gold, Inc. brought forth federal civil litigation against Honig, Pershing Gold Corporation, Sagebrush, and other defendants in the District Court for the District of Nevada, over causes of action related to the above facts concerning Sagebrush.

## FIRST CLAIM FOR RELIEF

**Civil Racketeering Influenced and Corrupt Organizations (RICO) Act (18 U.S.C. § 1962(c)) Violations Due to Conduct and Participation in a RICO Enterprise through a Pattern of Racketeering Activity Against Defendant Brauser Honig Frost Group, Defendant The Frost Group, Defendant Frost, Defendant Brauser, Defendant Honig, and Defendant Maza**

163.    Plaintiff Fisher re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1-162 into this First Claim for Relief as if fully set forth herein.

FIRST AMENDED COMPLAINT FOR
DAMAGES AND INJUNCTIVE RELIEF

164.     Defendants Elliot Maza, Phillip Frost, Barry Honig, Michael Brauser, Roberto Prego-Novo, Elliot Maza, The Frost Group and Brauser Honig Frost are "persons" within the meaning of the civil Racketeering Influenced and Corrupt Organizations Act, 18 USC 1961 et seq.

165.     At all times relevant to this claim, the above-named defendants have acted in concert in various combinations, forming a group of persons associated together for the common purpose of carrying out various similar schemes to obtain control of companies, defraud the shareholders and owners, loot the targer company of its assets for the actors' personal benefits, load the companies with debt by borrowing money in the target companies' name, and often force the target companies into bankruptcy.  In all such instances, including in the current instance targeting plaintiff Fisher, the common purpose was to reap unearned financial gain by defrauding shareholders, investors, and lenders.

166.     The continued association of the above-named defendants, acting together in carrying out unlawful schemes to defraud, constitutes an enterprise, within the meaning of 18 U.S.C.  1961 (4) ("the Frost/Brauser Enterprise"), which is engaged in unlawful activities, including securities fraud, which affect interstate commerce.

167.     Each of the above-named defendants have directed, assisted and supported the enterprise and the schemes through which the enterprise's frauds were implemented.  Each of the above-named defendants actively participated in the direction, operation or management of the Frost/Brauser Enterprise; the individual defendants actively participated in and implemented the decisions of the Frost/Brauser Enterprise, and the individual defendants' active participation played a vital and instrumental role in the achievement of the common goals of the Frost/Brauser Enterprise.

168.     In furtherance of the schemes of the Frost/Brauser Enterprise, the above-named defendants have committed and continue to engage in a practice of racketeering activity consisting of at least two or more predicate acts within the last 10-year period.  These predicate acts rest on wire and mail fraud, as prescribed by 18 U.S.C. 1341 and 1343, include a pattern of fraudulent schemes analogous to that which the Defendants used to defraud Fisher of his interest in BZL, and involve at least the following companies who are presently known to Fisher:

a.   Ben Franklin Technology Partners of Southeastern Pennsylvania, Frost, Brauser, Honig: fraudulent scheme involving OPKO health and subsidiaries, owned and operated by Frost, merger and warrant transactions with were not honored;

b.   Interclick, Inc., Brauser, Honig and others: related party transactions and proposals full of materially false and misleading information, all designed to benefit Brauser and Honig rather than shareholders;

c.   Sunair Services Corporation, Brauser, Honig and others: false and misleading representations and omissions of material fact in proxy solicitations to obtain control for Sunair's competitor;

d.   Equifax, Inc. and Naviant, Inc., Brauser, and others: fraud, deceit and misleading misrepresentations including fraudulent creation of fictitious receivables and accounting overstatements to promote merger negotiations;

e.   SendTec Inc, fka RelationServe Media, Brauser, Frost, Honig:  selling securities through unregistered broker/dealers, using material omissions and misrepresentations in a scheme to   defraud investors;

f.   Homebridge Mortgage Bankers Corporation, Brauser, Honig, Frost:  scheme to misappropriate confidential information and defraud a bank, settled with a purchase agreement which the Frost/Brauser Enterprise breached and took the bank's assets without paying for them;

g.   Tube Media Corporation, Brauser, Honig: fraud and omission of material fact of failure to remit payroll taxes from investors and the public, resulting in the precipitous drop of share value when discovered;

h.   Sagebrush Gold, Ltd, Honig, Frost: fraudulent scheme originally involving promotion of entertainment activities, including a heavyweight-boxing match whereby athlete was defrauded of prize-fight compensation, and then expanded to include mining interests whereby investors were fraudulently induced through unduly-influenced institutional endorsements into losses in the tens of million of dollars.

169.     These identified instances of fraudulent schemes, including the fraudulent schemed used

by Defendants against Fisher, have in common a pattern of investment-based practices: entering

into agreements, taking assets without paying the promised consideration, repeatedly using

misrepresentations and material omissions in violation of federal securities laws, all to the

financial detriment of shareholders and the investing public.

170.     These identified instances of fraudulent schemes all involve a common purpose with the

same participants utilizing similar fraudulent practices to those employed by defendants to take

over BZL, cheat Fisher out of his 22 years of work building BZL,  taking control, looting assets,

and then refusing to pay for the BZL stock or provide any of the other aspects of the promised

consideration; and form the predicate acts for Fisher's claim for RICO violations by the named

defendants from which Fisher has suffered damages.

171.     Unless curtailed by this Court, the Defendants' pattern of racketeering conduct using wire

and mail fraud remains a continuing threat to target companies, their shareholders and employees,

and the investing public.

WHEREFORE, plaintiff prays for relief as set forth below.

### SECOND CLAIM FOR RELIEF

**Civil Racketeering Influenced and Corrupt Organizations (RICO) Act (18 U.S.C. § 1962(c))**

**Violations Due to Conspiracy to Violate the RICO Act Against Defendant Brauser Honig**

**Frost Group, Defendant Brauser, Defendant Honig, Defendant The Frost Group, Defendant**

**Frost, and Defendant Maza**

172.     Plaintiff Fisher re-alleges and incorporates by reference each and every allegation set forth

in Paragraphs 1-171 into this Second Claim for Relief as if fully set forth herein.

173.     In violation of 18 U.S.C. § 1962(d), the Defendants conspired to conduct and/or

participate in the above mentioned Enterprise through a pattern of racketeering activity, in

violation of 18 U.S.C. § 1962(c).

174.     As a direct and proximate result of violations by the Defendants of 18 U.S.C. §§ 1341 and

1343, Plaintiff Fisher was caused to suffer injury in his business and property.  These damages

1  were caused by the Defendants' unlawful predicate acts of racketeering and their RICO

2  violations.

3  175.    Additionally, Plaintiff is entitled to recover treble damages, together with reasonable

4  attorneys' fees and costs incurred by this action.

5  WHEREFORE, plaintiff prays for relief as set forth below.

6  **THIRD CLAIM FOR RELIEF**

7  **Fraud Under California Law Against All Defendants**

8  176.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 175 into this Third

9  Claim for Relief as if fully set forth herein.

10  177.    The Defendants have perpetuated their pattern of fraudulent, willful, and deceptive so-

11  called "investment" practices in their approach towards Fisher, and their taking of his company,

12  BioZone Laboratories, Inc., which Fisher started and built over 22 years in Northern California.

13  178.    California Civil Code § 1709 defines fraud and deceit as willful deception of another with

14  intent to induce him to alter his position to his injury or risk, incurring liability for any damages

15  which is suffered as a result.

16  179.    California Civil Code § 1710 specifies, inter alia, three basic forms of fraud and deceit:

17  intentional misrepresentation of fact; suppression (concealment, non-disclosure) of a fact by one

18  who had a duty to disclose it; and a promise made without any intent of performance (promissory

19  fraud).

20  180.    All elements of the state-law claim for fraud and deceit by misrepresentation are present

21  in this Third Claim for Relief: misrepresentation (false representation, concealment or non-

22  disclosure); knowledge of falsity (scienter); intent to defraud, i.e. induce reliance; justifiable

23  reliance; and resulting damage.

24  181.    The Defendants herein made a series of misrepresentations, statements of fact which were

25  false: a) that they had the means and were willing to re-capitalize BZL with (at least) the infusion

26  of $8 million into BZL in order to grow the company and realize its potential and its assets,

27  including its patents and proprietary formulations; b) that they would pay Fisher $100,000 at

28  closing and issue 6,650,000 shares of stock to Fisher in the new company purchasing BZL's

assets; c) that they would pay Fisher $250,000 at closing for the in-excess-of $1,050,000 which Fisher had lent to BZL in times of financial need, which were properly-documented loans approved by the BZL Board of Directors, and make up the rest of the debt with shares of BP; d) that they would pay to Fisher the same rent for the use of the BZL facility; e) that they would employ Fisher for 3 years at an annual salary of $200,000; and f) that Fisher would participate in the management of BP after the closing.

182.    Fisher reasonably relied on the Defendants' misrepresentations and proceeded with the closing of the stock purchase transaction.  Fisher's reliance upon the Defendants' fraudulent actions was the immediate cause of his execution of the Stock Purchase Agreement; absent the Defendants' deliberately false statements and promises, he would not have entered in the stock-purchase transaction.

183.    Through their fraud, Defendants breached and dishonored every detail of the supposed stock purchase transaction, as alleged above.  Through their fraud, Defendants: took control of Fisher's company; excluded Fisher from all management or information about either company; used BZL's assets to acquire two companies about which Fisher knew nothing (Aero Pharmaceuticals and Baker Cummins); used BZL's assets to create BP from a "shell" public company, International Surf Resorts, which was represented as a "clean shell" into which BZL could be reverse-merged, but which was actually owned by Honig and Prego-Novo, and was laden with over $2 million in debt to those owners (this debt became serviced by BZL's assets after this fraudulent set of transactions); secreted all financial records of BZL and BP; sold or gave away BZL's intellectual property to OPKO, a company owned and controlled by defendant Frost; hired unknown expensive consultants who did nothing useful for BZL; paid unknown amounts to Maza, Brauser and Honig; paid nothing to Fisher for his stock; paid nothing to Fisher in repayment of his loans to BZL; paid nothing to Fisher to rent the BZL facility owned by Fisher; cut Fisher's promised annual salary; and summarily terminated Fisher's employment in a retaliatory manner.

184.    The stock alone was worth in excess of $26 million as of June 30, 2011.  The value of the stock alone has exceeded $30 million since June 30, 2011.  Whatever value the stock had on the

public market, then or now, was reaped by the Defendants and not Fisher nor his company BioZone Laboratories, Inc.

185.    In keeping with their pattern of fraudulent behavior over numerous other transactions as described above, Defendants also committed fraud on Fisher by their suppression and concealment of material facts regarding: a) the relationship of the purchasing group to Aero Pharmaceuticals, to Baker-Cummins, and to International Surf Resorts; b) the true nature of the International Surf Resorts transactions; c) the long history of fraud-related lawsuits and schemes in which Brauser, Honig and Frost, and, upon information and belief, Maza and Prego-Novo, have been involved; d) the true relationship of Maza and Prego-Novo to the other defendants, including their long involvement with Frost, Brauser and Honig in similar fraudulent schemes to take over target companies, loot them of all valuable assets, load them up with debt, and then put them into bankruptcy; and e) other facts which have never been disclosed to Fisher.  Furthermore, the complicity of defendant Keller in setting up BZL as a target and planning to cheat Fisher out of any consideration for his shares in BZL was kept secret from Fisher in the fraudulent activities of the Defendants.

186.    The Defendants also committed fraud on Fisher by promissory fraud, having made promises to Fisher, as alleged in this Third Claim for Relief, which none of the defendants, especially not Frost, Brauser, nor Maza, ever intended to honor.  In particular, defendants promised to Fisher that they would infuse at least $8 million of new capital into the new company BP to assist BP to grow to its potential, and they represented this motivation – that is, to help further develop and build the company which Fisher had placed his energies into for decades – as the supposed reason for their investment in BZL.

187.    After literally taking Fisher's company away from him without providing compensation, the investor defendants refused to infuse any capital into the new company BP, or to take any action other than giving away BZL assets to the defendants and/or their related companies, such as OPKO Health, an entity controlled by defendant Frost which obtained all of BZL's intellectual property without payment; and borrowing money and transferring debt obligations into BZL and thereby BP.

188.     Fisher has been damaged by the fraud and deceit of the Defendants, and each of them are jointly and severally liable for these damages.

WHEREFORE, plaintiff prays for relief as set forth below.

## FOURTH CLAIM FOR RELIEF

### Violation of Section 10b of the 1934 Securities and Exchange Act and SEC Rule 10b-5

### Against All Defendants

189.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 188 into this Fourth Claim for Relief as if fully set forth herein.

190.     Section 10b of the 1934 Securities and Exchange Act constitutes the basic anti-fraud provisions of the federal securities laws, prohibiting any person from using any manipulative or deceptive device in connection with the purchase or sale of any security, in contravention of such rules or regulations as the SEC may proscribe as necessary.

191.     The SEC promulgated SEC Rule 10b-5, which makes it unlawful for any person to make any untrue fact or to omit to state a material fact or to engage in any practice or course of conduct which operates as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

192.     As alleged in detail above and incorporated herein, the investor defendants, aided and abetted by defendants Maza and Keller, committed fraud and misrepresentations in connection with their purchase of the stock of the California corporation of BioZone Laboratories, Inc.  The Frost-related investors and Maza, their agent, lied about every aspect of the purchase transaction. In particular, they promised that the consideration for Fisher's sale of his 55% of BZL securities, consisting of: 6.650 million shares of the new company as promised; $100,000 upon closing; a salary of $200,000; repayment of Fisher's loans to BZL total in excess of $1,050,000; payment of rent for the continued use of Fisher's building; and capitalization of the new company consisting, at a minimum, of an infusion of $8 million in investment into BP for the purpose of growing the company and bringing value to its stock.

193.     These promises were made by the Defendants to plaintiff Fisher with the specific intents of: not honoring the promises; obtaining possession of BioZone Laboratories and its assets and

1   subsidiaries without any payment at all; looting BZL by stripping it of its assets including its

2   patents and other intellectual property and proprietary formulations and licenses; selling off the

3   valuable assets of BZL to entities related to the investors such as OPKO (owned by Frost, a fact

4   which was never disclosed to the public) for little or no consideration; and destroying the good

5   will and value of BZL built by Fisher over two decades, in order to profit from the looting of the

6   company, and from the fraudulent marketing of the stock to unsuspecting investors.

7   194.    Another aspect of the fraud surrounding this purchase transaction was the creation of the

8   new company BP by a fraudulent "reverse merger" by first re-naming a purportedly clean

9   corporate shell, which in fact was not clean but carried substantial debt that transferred into BP

10   and thereby to BZL, when it was reverse-merged into BP.  The corporate shell, fraudulently held

11   forth as clean but in actuality loaded with debt, had just been purchased by two of the defendant

12   investors, Prego-Novo and Honig.

13   195.    Yet another aspect of the fraud permeating this stock purchase transaction was the use of

14   the "reverse merger" device in which BioZone Pharmaceuticals, Inc. (BP) acquired BioZone

15   Laboratories, Inc. (BZL).  Intentional and deliberate inflation of the share value of the newly-

16   renamed public company BioZone Pharmaceuticals, Inc., which at the time of its renaming in

17   March 2011, had no assets and no operations (as the purchase of BZL stock would not occur for

18   another four months), occurred in a classic "pump and dump" operation; due to the flagrant

19   abuses and fraudulent actions of the Defendants, the capital gained by the so-called "purchase" of

20   BioZone Laboratories ended up going to the "investor" defendants, and not to BP, and not to

21   plaintiff Fisher.

22   196.    Yet another aspect of the fraudulence of the stock purchase transaction was the bogus

23   "acquisition" by BP of two companies which were owned and operated by some of the

24   defendants.  These fraudulently acquired companies were Aero Pharmaceuticals and Baker

25   Cummins, which received 12.43% of BP stock without any efforts taken to determine an actual

26   valuation of those entities.

27

28

197.    The defendants have, since June 2011 and continuing to date, submitted to the Securities and Exchange Commission deliberately false representations of the value, activities and financial condition of BP and its subsidiary BZL.

WHEREFORE, plaintiff prays for relief as set forth below.

## FIFTH CLAIM FOR RELIEF

### Violation of Dodd-Frank Wall Street Reform and Consumer Protection Act,

### 15 U.S.C. § 78u-6h(1)(A), Against All Defendants

198.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 197 into this Fifth Claim for Relief as if fully set forth herein.

199.    The Dodd-Frank Act provides in relevant part that "No employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower."

200.    Under Dodd-Frank, at 1b U.S.C. § 78u-6 (a) (6), a "whistleblower" is defined as "any individual who provides . . . information relating to a violation of the securities laws to the Commission in a manner established by the Commission."

201.    Fisher utilized a mechanism established by the SEC for submitting complaints regarding publicly-traded companies, and submitted such information to the SEC, which information related to violations of Section 9 of the Securities Exchange Act of 1934 and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

202.    Promptly following Fisher's submission of his complaint to the SEC which related to his inquiries that were not answered by the Defendants, and his concerns about the misrepresentations being made by the Defendants, defendant Maza threatened to discharge Fisher and then did in fact terminate Fisher's employment.  Fisher's employment was part of the consideration promised (but never given) to him for transfer of his shares of stock of his company, BioZone Laboratories (BZL), to the defendants' shell company, BioZone Pharmaceuticals (BP).

203.    Fisher seeks monetary damages as set forth in the Dodd-Frank Act, two times the back

pay otherwise  owed, with interest; and injunctive relief restoring him to his position with BP.

Fisher is further entitled to compensation for litigation costs, expert witness fees, and reasonable

attorneys' fees, pursuant to 15 U.S.C. § 78u-6(h)(1)(C)(iii).

WHEREFORE, plaintiff prays for relief as set forth below.

### SIXTH CLAIM FOR RELIEF

**Wrongful Termination in Violation of Public Policy Against All Defendants**

204.    Plaintiff Fisher re-alleges and incorporates by reference each and every allegation set forth

in Paragraphs 1 through 203 into this Sixth Claim for Relief as if set forth herein.

205.    Under California law, termination of an employee in violation of public policy, including,

without limitation, termination in retaliation for making a complaint to a public agency of

unlawful behavior and refusing to join the employer in unlawful acts, is actionable without regard

to any practice or agreement that the employee's employment is "at will" or can be terminated by

the employer.

206.    The Dodd-Frank Wall Street Reform Act provides in relevant part that disclosure of

violations of the federal securities laws is a protected act, for which retaliation by the employer is

unlawful.

207.    Fisher was fired by the defendants in retaliation for his submission of information to the

SEC regarding the Defendants' wrongful and fraudulent acts, including violations of the federal

securities laws.

208.    Fisher was damaged by the Defendants' wrongful termination of his employment, in

retaliation for providing information to the SEC regarding the Defendants' unlawful and

fraudulent conduct.

WHEREFORE, plaintiff prays for relief as set forth below.

### SEVENTH CLAIM FOR RELIEF

**Breach of Stock Purchase Agreement Against All Defendants**

209.    Plaintiff Fisher re-alleges and incorporates by reference each and every allegation set forth

in Paragraphs 1 through 208 into this Seventh Claim for Relief as if fully set forth herein.

210.    In March 2011, four months before BZL stock was purportedly purchased, but in actuality, stolen through a fraudulent scheme perpetrated by the Defendants, individual defendants, through Maza, Brauser, and Prego-Novo, fraudulently and under the auspices of transitioning BZL from a private to a public company, took complete control of BZL, including control of all management and financial decisions, and all BZL assets and property.  The Defendants proceeded, without any formal process or consent by BZL shareholders, to appoint defendant Prego-Novo as President of BZL, and to appoint defendant Maza as Chief Financial Officer and General Counsel.  Maza and Prego-Novo excluded the BZL shareholders from any control or information about BZL operations, and removed all financial records from California to New Jersey.

211.    On June 30, 2011, Fisher and other BZL shareholders, and Prego-Novo on behalf of the individual defendants and nominally for BP, executed the closing documents for the stock purchase transaction, by which the selling BZL shareholders relinquished their shareholder interests in return for the consideration set forth in all the closing documents including the Stock Purchase Agreement.  Fisher was fraudulently induced to execute the Stock Purchase Agreement without even being provided with a copy of what he was signing until several months later, when he was provided with a copy of the document purporting to be what he had signed.  Fisher, to date, has never been provided with many of the accompanying documents related to the various transactions, including the International Surf Resorts "reverse merger" transaction, and has never been provided with or seen the original fraudulently executed agreement.

212.    The Stock Purchase Agreement ("SPA"), which defendants fraudulently induced Fisher to sign, provided that part of the consideration to be paid to Fisher for his majority interest in BZL would be 6,650,000 shares of BP, the new company BioZone Pharmaceuticals, Inc.  Fisher was to receive 20% of the shares at closing through delivery to the escrow agent, and the balance of the shares was to be delivered irrevocably to Fisher within five days after the closing.  Execution of the several other closing documents which, along with the SPA, were never provided to Fisher, was a condition of the consideration for Fisher's interest in BZL, as provided in the SPA.

213.    No shares in BP were ever issued or provided to Fisher at any time.  The deliberately and ongoing fraudulent transaction continued with the Defendants' refusal to issue any shares of BP stock to Fisher was a deliberate and intentional breach of the fraudulent SPA.  Shares of BP were selling on the stock market for approximately $4.00 per share at the time of the June 30, 2011, making the value of such shares in excess of $26 million at the time, and have since reached as high as $4.65 per share, making the value of such shares in excess of $30 million.

214.    Since the June 30, 2011 closing, the Defendants have: deliberately and intentionally destroyed the operations of BZL; given away the assets of BZL to themselves and related companies which they control; and diminished any value which existed in the stock of the new company BP.  Issuing BP shares at this point to meet its disregarded promise in June 2011 would be an empty act and a continued fraud on Fisher, who elects either to receive the market value of the shares at the time of closing which were fraudulently promised to Fisher in the June 30, 2011 Stock Purchase Agreement or, in the alternative, the maximum market value of the shares since the time of closing.

215.    Another aspect of the BP purchase of Fisher's BZL shares was payment of $100,000 to Fisher at closing; this provision was eliminated or changed in the documents provided to Fisher several months after the closing.  Another $100,000 was supposed to be provided to the selling shareholders upon the sale of Cardium Therapeutics, owned by BZL.  Neither amount was ever paid to Fisher.

216.    The June 30, 2011 SPA, part of the Defendants' fraudulent scheme, further promised that the debts in excess of $1,050,000 owed to Fisher from BZL would be paid by a $250,000 payment to Fisher at closing and the balance converted to BP common stock ($1 debt to one share of stock).  No such payment was made to Fisher at any time and no conversion to stock or issuance of stock ever occurred.

217.    The provisions and implementation of the SPA and related documents were misrepresented in Defendants' filings with the SEC regarding the purchase transaction.

218.    The Defendants' fraudulent inducement to Fisher to enter the Stock Purchase Agreement, and their deliberate breach of the Stock Purchase Agreement were planned, intentional and done

1  in bad faith.  These actions were intended to cheat and defraud Fisher of the consideration for

2  selling his company to the "investor" defendants.  Fisher has been damaged from these fraudulent

3  actions and breaches in an amount to be determined at trial of this action.

4  WHEREFORE, plaintiff prays for relief as set forth below.

5  **EIGHTH CLAIM FOR RELIEF**

6  **Intentional Infliction of Emotional Distress Against All Defendants**

7  219.    Plaintiff Fisher re-alleges and incorporates by reference each and every allegation set forth

8  in Paragraphs 1 through 218 into this Eighth Claim for Relief as if fully set forth herein.

9  220.    The conduct of the individual defendants as alleged and incorporated herein, including:

10  fraud under federal law in connection with the purchase of Fisher's shares in BioZone

11  Laboratories, the company in Northern California he founded and developed over 22 years; fraud

12  and deceit under California law; retaliatory termination wrongful under both federal and state

13  law; breach of all the promises and fraudulent agreements made by the Defendants to induce

14  Fisher to sell his shares and then to be forced to witness the looting and theft of the assets of the

15  company he founded and helped build; and all the other intentional acts alleged herein, have

16  caused plaintiff severe and continuing emotional distress.

17  221.    Under California law, such intentional fraudulent conduct as alleged and incorporated into

18  this Eighth Claim for Relief is outrageous and intolerable in a civilized society.

19  222.    The conduct alleged above and incorporated herein was designed to, and did, cause

20  plaintiff severe and enduring emotional distress, including great mental, physical and nervous

21  pain and suffering as manifested by anxiety, headaches, nightmares, depression, insomnia, and

22  inability to concentrate.

23  223.    The malicious, intentional, and willful conduct alleged above, and incorporated herein,

24  was inflicted with reckless disregard for the foreseeable harm done to plaintiff Fisher, entitling

25  plaintiff to an award of punitive damages.

26  WHEREFORE, plaintiff prays for relief as set forth below.

27

28

## NINTH CLAIM FOR RELIEF

### Unjust Enrichment Against All Defendants

224.    Plaintiff Fisher re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1-223 into this Ninth Claim for Relief as if fully set forth herein.

225.    Defendants have benefited from their de facto theft of plaintiff Fisher's economic interests and of the company which Fisher built over the course of more than two decades.

226.    Defendants have not compensated plaintiff for these benefits.

227.    These benefits have therefore come at the expense of plaintiff Fisher.

228.    Equity and good conscience require that plaintiff Fisher receive restitution.

229.    Furthermore, plaintiff should be awarded punitive damages due to the egregious nature of the Defendants' actions, and because sound public policy dictates that so-called "investment" practices such as those inflicted by the Defendants upon plaintiff ought to be discouraged in the most vehement of manners.

WHEREFORE, plaintiff prays for relief as set forth below.

## TENTH CLAIM FOR RELIEF

### Conversion Against All Defendants

230.    Plaintiff Fisher re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1-229 into this Tenth Claim for Relief as if fully set forth herein.

231.    Plaintiff Fisher possesses a right to shares of BioZone Pharmaceuticals, Inc.  The Defendants fraudulently induced plaintiff into entering a stock purchase agreement whereby, among other consideration, plaintiff should have received shares of BZP in exchange for plaintiff's majority shares of BioZone Laboratories, Inc.

232.    Defendants, after taking all of plaintiff's shares of BZL, have intentionally either taken possession of all of plaintiff's shares of BioZone Pharmaceuticals, Inc. or failed entirely to issue the requisite shares of BP to plaintiff.   Defendants have prevented plaintiff from having access to his rightful shares of BP.

233.    Plaintiff Fisher did not, at any time, consent to the activities of the Defendants in divesting Fisher of his right to possess shares of BioZone Pharmaceuticals, Inc.

234.    Plaintiff has been economically harmed by the actions of the Defendants.  Plaintiff Fisher is contractually entitled to 6,650,000 shares of BioZone Pharmaceuticals, Inc. Shares of BP were selling on the stock market for approximately $4.00 per share at the time of the June 30, 2011, making the value of such shares in excess of $26 million at the time, and have since reached as high as $4.65 per share, making the value of such shares in excess of $30 million.

235.    Defendants' conduct in either holding or refusing to issue to plaintiff, and refusing to give plaintiff. his shares of BP stock has been, and continues to be, a substantial factor in causing Plaintiff Fisher's damages with regard to his rights to possess shares of BioZone Pharmaceuticals, Inc.

236.    Plaintiff is entitled to damages from Defendants equal in amount to the value of the BP shares which plaintiff rightfully should have possessed at either the time the Defendants took plaintiff's shares of BZL, when Defendants fraudulently promised and agreed to give plaintiff the BP shares, or, when BP shares have been at their maximum value from the time of plaintiff's rightful possession of them, and including interest during the period in which the Defendants have deprived plaintiff of his shares.

WHEREFORE, plaintiff prays for relief as set forth below.

## ELEVENTH CLAIM FOR RELIEF

### Tortious Interference with Contract Against All Defendants

237.    Plaintiff Fisher re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1-236 into this Eleventh Claim for Relief as if fully set forth herein.

238.    Defendant BP is the successor in interest to a number of customer-based and third-party vendor contracts pursuant to its so-called acquisition of Plaintiff Fisher's former company BioZone Laboratories, Inc.

239.    The actions of the Defendants in failing to honor the terms of these customer-based and third-party agreements have exposed plaintiff Fisher to civil liability in that Fisher has been named in at least one civil litigation arising from Defendants' failure to observe the terms of their contractual obligations.

240.     Defendants engaged in intentional activity designed to disregard and disrupt the

contractual relationships among Defendant BP, customers, and third-party vendors.

241.     Defendants intentionally perpetrated breaches of these contracts without justification.

242.     Plaintiff has suffered damages attributable to these breaches by the Defendants.

243.     Defendants are liable for these damages due to their tortious interference with the

contractual relationships between BioZone Laboratories, Inc., or defendant BP, on the one hand,

and customers or third-party vendors, on the other hand.

244.     Plaintiff Fisher is also entitled to any costs of defending against litigation brought forth as

a result of the Defendants' tortious conduct.

WHEREFORE, plaintiff prays for relief as set forth below.

## TWELFTH CLAIM FOR RELIEF

### Tortious Interference with Prospective Business Advantage Against All Defendants

245.     Plaintiff Fisher re-alleges and incorporates by reference each and every allegation set forth

in Paragraphs 1-244 into this Twelfth Claim for Relief as if fully set forth herein.

246.     Defendants have divested Plaintiff Fisher of his interests in a company which he built

from the ground up over the course of 22 years, in an effort to deliver sustained medical value to

the public and to promote innovation in health and technology.

247.     Defendants engaged in intentional activity designed to usurp Plaintiff Fisher's interests in

his company, and more perniciously, to destroy the business interest Plaintiff Fisher had built up

over the years in an unabashedly greedy effort to choke profits out of an entity without any regard

whatsoever to the viability and integrity of that business interest.

248.     As a result of Defendants' actions, Plaintiff Fisher has been depleted of his ability to

obtain economic benefit from the proper exchange of investment funding for the company that he

developed and nurtured.

249.     Defendants intentionally perpetrated these deprivations without justification.

250.     Plaintiff has suffered damages attributable to the actions of the Defendants.

251.     Defendants are liable for these damages due to their tortious interference with the

prospective business advantage between plaintiff Fisher with respect to his ownership interest in

1    the predecessor company BioZone Laboratories, Inc., on the one hand, and proper investors who

2    transact business and preserve the interests of the companies under their control, on the other

3    hand.

4    252.    Furthermore, plaintiff should be awarded punitive damages due to the egregious nature of

5    the Defendants' actions, and because sound public policy dictates that those who engage in the

6    above-described types of so-called investment practices, to the detriment of those who are

7    contributing positively to society and creating real economic value, ought to be strongly deterred

8    from engaging in their fraudulent and harmful activities.

9                                      **PRAYER FOR RELIEF**

10   WHEREFORE, plaintiff prays that this Court grant, order and award the following relief to him:

11   1.      Declaratory Relief;

12   2.      Injunctive Relief;

13   3.      Award compensatory damages and punitive damages on the First and Second Claims for

14   Relief according to proof, and an award of plaintiff's attorneys fees and costs, as provided under

15   federal statute;

16   4.      Award compensatory and punitive damages on the Third Claim for Relief according to

17   proof, as provided under California law;

18   5.      Award compensatory and punitive damages on the Fourth Claim for Relief according to

19   proof, and an award of plaintiff's attorneys fees and costs, as provided under federal statute;

20   6.      Award statutory damages on the Fifth Claim for Relief according to proof, and an award

21   of plaintiff's attorneys fees and costs, as provided under federal statute;

22   7.      Award compensatory and punitive damages on the Sixth Claim for Relief according to

23   proof, as provided under California law;

24   8.      Award compensatory damages on the Seventh Claim for Relief according to proof, as

25   provided under California law;

26   9.      Award compensatory and punitive damages on the Eighth Claim for Relief according to

27   proof, as provided under California law;

28

10. Award compensatory and punitive damages on the Ninth Claim for Relief according to proof, as provided under California law;

11. Award compensatory and punitive damages on the Tenth Claim for Relief according to proof, as provided under California law;

12. Award compensatory and punitive damages on the Eleventh Claim for Relief according to proof, as provided under California law;

13. Award compensatory and punitive damages on the Twelfth Claim for Relief according to proof, as provided under California law;

14. Award plaintiff his costs of suit including an award of his reasonable attorneys fees as provided by statute; and

15. Such other and further relief as the Court may deem just and proper.

**DEMAND FOR TRIAL JURY**

Plaintiff reiterates his request for trial of this Amended Complaint by a jury, pursuant to Federal Rule of Civil Procedure 38(b).

Dated: November 22, 2012

Respectfully Submitted,

LAW OFFICES OF DARCY AUGUST PAUL

By: /s/ Darcy Paul

3235 Kifer Road, Suite 360
Santa Clara, CA 95051
Telephone: (408) 617-0800
Facsimile: (408) 617-0810
Email: dapaul@darcypaul.com

Attorney for Plaintiff Daniel Fisher