1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

San Francisco Division

11

| | |
|---|---|
| 12   DANIEL FISHER, | Case No.12-cv-03716-LB |
| 13          Plaintiff, | |
| 14       v. | **ORDER ENFORCING SETTLEMENT** |
| 15   BIOZONE PHARMACEUTICALS, INC., et al., | Re: ECF No. 95 96 |
| 16 | |
| 17          Defendants. | |

18

### INTRODUCTION

19      Before the court are two crossing motions to enforce the parties' 2013 settlement agreement.

20 The plaintiff's motion (ECF No. 95)[1] seeks to enjoin the defendant from foreclosing on the

21 plaintiff's commercial property. It also asks the court to release the plaintiff and his wife as

22 guarantors on the property's mortgage note. This motion centers factually on the defendant's

23 earlier assignment of a lease on the property.

24      The defendants' motion (ECF No. 96) asks the court to bar the plaintiff from making further

25 disparaging statements about them; the defendants would also compel the plaintiff to withdraw

26
27

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
28   ECF-generated page numbers at the top of documents.

United States District Court
Northern District of California

1  grievances that he has filed with government agencies. This motion centers factually on the

2  plaintiff's continuing to tell third parties, after the settlement, that the defendants were engaged in,

3  and were being investigated for, unsavory business practices, including securities fraud.

4      The undersigned retained jurisdiction to enforce the settlement. The court held a hearing on

5  these motions on March 2, 2017.

6      For the reasons given below, the court denies the plaintiff's motion insofar as it seeks to

7  release the plaintiff and his wife from their guaranties. Insofar as the plaintiff seeks to enjoin the

8  imminent foreclosure, the court directs the parties to provide additional briefing on whether

9  foreclosing on an underwater commercial property can constitute "irreparable injury" for purposes

10 of an injunction. The court grants the defendants' motion. The court prohibits the plaintiff from

11 making any further disparaging comments about the defendants. The plaintiff is ordered to fully

12 comply with the settlement agreement's non-disparagement term. Finally, the court fines both Mr.

13 Fisher and Mr. Brauser (not their lawyers) for violating the settlement agreement's non-

14 disparagement clause. The parties must remit the fines to one of the legal-aid programs listed on

15 the State Bar of California's website.

16

17                                     **STATEMENT**

18      There is no need to revisit the parties' underlying dispute. For present purposes the story can

19 start with the 2013 settlement agreement that was meant to put that dispute to rest. Only some

20 basic facts are necessary to understanding that agreement, the parties' later dealings, and thus the

21 present motions.

22

23 **1.  Assignment of the 580 Garcia Lease**

24      The parties' settlement agreement has an effective date of September 5, 2013. When they

25 signed that agreement, plaintiff Daniel Fisher and defendant CoCrystal[2] were in the following

26

27

28 [2] CoCrystal is, by its own admission, the successor to the original defendant, and party to the
   settlement, BioZone Pharmaceuticals, Inc. For simplicity, this discussion refers only to CoCrystal.

United States District Court
Northern District of California

relationship. Mr. Fisher and his wife were (and still are) the sole owners of 580 Garcia LLC,
which in turn owns a commercial property located at 580 Garcia Avenue in Pittsburg, California.
CoCrystal leased that property from the LLC. The LLC was the debtor on a mortgage note on the
580 Garcia property. The Fishers are personal guarantors of that note.

Under § 3 of the settlement agreement, CoCrystal agreed to "timely perform all [its] future
obligations" under the 580 Garcia lease.[3] One term of that lease provided that the lease could be
assigned only with the LLC's consent.[4] The related deed of trust on the property in turn provided
that the bank could accelerate the note if the lease were assigned without its consent.[5] Assigning
the lease thus required both the LLC's and (as a practical matter) the bank's consent.

Mr. Fisher now claims that, in violation of both the lease and the settlement agreement,
CoCrystal assigned the lease on 580 Garcia without the LLC's or the bank's consent. This appears
to be correct. In November 2013, a third company (MusclePharm) agreed to acquire CoCrystal.
Mr. Fisher and CoCrystal both tried to get the mortgagee bank to agree that CoCrystal could
assign the lease to MusclePharm. It appears to be undisputed that Mr. Fisher wanted the bank to
approve the assignment. The LLC was behind in paying the note; and Mr. Fisher himself testified
that MusclePharm presented a more creditworthy tenant. The bank, however, would not approve
the assignment.

Nevertheless, as part of an acquisition and asset sale, CoCrystal assigned the lease to
MusclePharm. The bank then declared an incurable default and accelerated the loan. For the next
three months — April through June 2014 — Mr. Fisher stopped paying the bank; he claims to
have put the money into an escrow account.

Months later, after negotiating with the bank, CoCrystal itself bought the note. CoCrystal
complains that it has received none of the money that Mr. Fisher says is in escrow. Nor has it
received any of the interest that is owed on the April–June 2014 payments. The record suggests —

---

[3] Settlement Agreement – ECF No. 95-6 at 3 (§ 3).

[4] Lease – ECF No. 95-2 at 10 (§ 18).

[5] *See* Deed of Trust – ECF No. 95-4 at 3 (due-on-sale clause).

CoCrystal's own filings suggest — that the LLC made at least some payments for subsequent months.[6] There is no dispute, however, that at least some of the payments owed to CoCrystal have not been made, so that the loan is in default. Eventually, CoCrystal decided to foreclose on 580 Garcia. It scheduled a foreclosure sale for January 27, 2017. Mr. Fisher moved to enforce the settlement agreement and sought a TRO to block the foreclosure. (ECF No. 95.) The defendants then filed their own settlement-enforcement motion. (ECF No. 96.) After a telephonic hearing with this court, just two days before the scheduled foreclosure, CoCrystal agreed to postpone the foreclosure. *See* (ECF No. 102.) The court denied Mr. Fisher's TRO application as moot, and the parties finished briefing the present motions.

## 2. Disparagement

In their motion, defendants Brauser and Honig claim that Mr. Fisher breached the settlement agreement's non-disparagement clause by telling third parties, and by filing a new state-court lawsuit in which he claimed, that the defendants were guilty of the misconduct that the settlement agreement was supposed to put to rest. This too seems to be correct. The settlement's non-disparagement clause provides:

> **Non-Disparagement.** Plaintiff agrees that he will not, directly or indirectly, in any communication with any person or entity, including . . . any third-party media outlet, make any derogatory, disparaging or critical negative statements, orally, written or otherwise, against any Defendant or any Defendant's managers, directors, officers and employees, as [*sic*] . . . aiding or participating in any way with any third party . . . in the publication of any such derogatory, disparaging or critical negative statements against any Defendant . . . . Each Defendant agrees that it will not, directly or indirectly, in any communication . . . make any derogatory, disparaging or critical negative statements, orally, written or otherwise, against Plaintiff or aiding or participating [*sic*] in any way with any third party . . . in the publication of any such . . . negative statements against Plaintiff. Nothing herein shall prevent any Party from testifying truthfully in connection with any litigation, arbitration or administrative proceeding when compelled by subpoena, regulation or court order to do so.[7]

---

[6] *See* Wilcox Decl. – ECF No. 99 at 5 (¶ 14).

[7] Settlement Agreement – ECF No. 95-6 at 9 (§ 24).

United States District Court
Northern District of California

The defendants challenge four items (discussed below) as breaching this clause. There appears to be no real dispute that the content of all the challenged communications falls within the sweep of the non-disparagement clause. That is to say, unless there is some extrinsic excuse for making the challenged comments, the non-disparagement clause covers and prohibits such communications.

At the hearing on these motions, the defendants added that, under the settlement, Mr. Fisher was supposed to withdraw grievances that he filed with the SEC and FBI concerning the defendants — but that he has not done so. Mr. Fisher did not deny this.

### 2.1 State-Court Complaint

The first item consists of allegations in a lawsuit. In June 2014, nine months after the settlement agreement in this case, 580 Garcia LLC filed a new lawsuit in California state court. The Second Amended Complaint in that case named as defendants several of the parties to the settlement agreement: specifically, Biozone Pharmaceuticals; CoCrystal Pharma, Inc.; Elliot Maza; Phillip Frost; Roberto Prego-Novo; and Brian Keller.[8] Neither Mr. Honig nor Mr. Brauser is a defendant in that complaint, though allegations within the pleading implicate both men by name.[9] The Second Amended Complaint alleged that the defendants "orchestrated" a "series of interrelated frauds, wrongful acts and potential white-collar crimes," and that these included a scheme of "pump and dump securities fraud."[10] The complaint both refers to the 2013 settlement agreement in this case[11] and states that the plaintiff "began suspecting that the defendants were engaged in "inappropriate and illegal activity" in "early 2011."[12] The plaintiff eventually withdrew this pleading.[13]

---

[8] *Compare* 2nd Am. Compl. – ECF No. 96-3 at 1 *with* Settlement Agreement – ECF No. 95-6 at 2.

[9] 2nd Am. Compl. – ECF No. 96-3 at 6, 18 (¶¶ 24, 58).

[10] *Id.* at 6 (¶¶ 24–25).

[11] *Id.* at 12 (¶ 39).

[12] *Id.* at 18 (¶ 58).

[13] Varnavides Decl. Ex. B – ECF No. 96-4 at 2.

United States District Court
Northern District of California

The defendants thus seem correct in arguing that this Second Amended Complaint advanced, if not "the very same allegations that [were] dismissed in this action," at least charges that were covered by the settlement agreement in this case.

## 2.2 The Drose Email

On June 26, 2016 — so, again, well after the settlement agreement in this case — Mr. Fisher emailed journalist Christopher Drose.[14] Mr. Fisher congratulated Mr. Drose on a recent article (whose  contents, according to the defendants, "parroted many of the allegations made by [Mr. Fisher] in this action and in the withdrawn" Second Amended Complaint, discussed above).[15] More to the present point, in this email Mr. Fisher identified himself as a "long time [sic] judicial adversary" of Mr. Honig and Mr. Brauser (among other people); he accused these men of "breach[ing] almost every agreement and every regulation that confronted them"; and he told Mr. Drose that he had filed an SEC whistleblower complaint and "multiple Federal and State lawsuits against them."[16] Mr. Fisher suggested that the defendants' "strategy is to bankrupt . . . their adversaries (me)."[17] He ended by accusing the defendants of employing "unscrupulous" lawyers who themselves "may be indicted."[18]

## 2.3 The Buhl Article

The third challenged item is another journalist's report. On November 8, 2016, reporter Teri Buhl emailed Mr. Honig's attorneys and wrote:

> I am going to report on on [sic] Daniel Fisher being interviewed by the FBI in Northern California and being told he is a victim in a securities fraud case related to The Frost Group (which documents show equals Honig, Frost, Brauser). A check in the FBI victims identification database yesterday show[s] the investigation is still active.

---

[14] ECF No. 96-6 at 1.

[15] Id.

[16] Id.

[17] Id.

[18] Id.

Let me know if Barry [Honig] wants to comment.[19]

According to the defendants, Ms. Buhl published her story the same day. Again according to the defendants, she cited an "unnamed source" as telling her that the FBI was investigating Mr. Honig and Mr. Brauser, that the source was a "potential victim of securities fraud," and that the "only securities" the victim had were Biozone's.[20] The defendants suggest that Ms. Buhl's source was Mr. Fisher. Strictly speaking, though, even as the defendants relate matters, Ms. Buhl did not name her source.

### 2.4 The Pederson Letters

Finally, Mr. Honig and Mr. Brauser point to two letters - one dated September 9, 2016 and the other September 29, 2016 — that Mr. Fisher's attorney, Lee Pederson, sent to a member of CoCrystal's board of directors.[21] Neither letter names Mr. Honig or Mr. Brauser.[22] Both letters, however, reiterate assertions that figured into this case, including that something called "the Frost gang" engaged in alleged "pump and dump fraud involving" Biozone.[23] And, as the defendants fairly observe, the second letter made allegations that closely mirror those made in the Second Amended Complaint discussed earlier.[24] Mr Pederson copied both letters to the SEC Office of the Whistleblower, and his second one to the U.S. Attorney General as well.[25]

### 2.5 The Brauser Interview

Mr. Fisher answers with his own charge of disparagement. In one July 2015 interview with a financial blog, Mr. Brauser said that the "founder" of Biozone "had misrepresented tremendous amounts about the company," and, after being forced from the company, had "attempted to

---

[19] ECF No. 96-7 at 1.

[20] *See* Varnavides Decl. – ECF No. 96-2 at 5 (¶¶ 17–18).

[21] Varnavides Decl. Exs. F, G – ECF Nos. 96-8, 96-9.

[22] *See id.*

[23] *See* ECF No. 96-8 at 2.

[24] *Compare* 2d Am. Compl. – ECF No. 96-3 at 9 (¶ 34) *with* ECF No. 96-9 at 2.

[25] ECF No. 96-8 at 6; ECF No. 96-9 at 10.

1  blackmail" Mr. Brauser, which "got him into a bit of trouble" when proof of the attempted

2  "blackmail" was shown to a federal judge during a lawsuit.[26] The "founder" of Biozone was Mr.

3  Fisher, but in the interview Mr. Brauser does not mention him by name.[27]

4  <center>*  *  *</center>

5  <center>**ANALYSIS**</center>

6  <center>**Plaintiff's Motion for Preliminary Injunction (ECF No. 95)**</center>

7  <center>**(Breach of Lease)**</center>

8       The plaintiff asks for two main things: an injunction against foreclosure and to release him and

9  his wife from their guaranties of the note on the property. The plaintiff has made absolutely no

10  showing that the court should or even can cancel the guaranties. And, while it is clear that the

11  defendants technically breached the lease and thus § 3 of the settlement agreement, it is not clear

12  that the plaintiff is entitled to enjoin a foreclosure. The best way to approach this is through the

13  elements of an injunction.[28]

14       "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the

15  merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

16  balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v.*

17  *Natural. Res. Def. Council*, 555 U.S. 7, 20 (2008). The standard for a permanent injunction is

18  "essentially the same . . . with the exception that" a plaintiff must achieve "actual success" on the

19  merits to garner a permanent injunction. *Id.* at 32 (quoting *Amoco Prod. Co. v. Village of Gambell,*

20  *Alaska*, 480 U.S. 531, 546 n. 12 ((1987)).[29]

21

22  [26] ECF No. 109-4 at 2–3.

23  [27] *See id.*, *passim.*

24  [28] The plaintiff also claims that the defendants breached the settlement agreement's general "good
faith" obligation (§ 5). But the plaintiff has not shown that the defendants breached the lease in bad

25  faith. The facts before the court do not begin to allow that inference. See the discussion in Part 3,
below.

26  [29] The court leaves aside the complication to the injunctive standard introduced by *Alliance for the
Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) as unnecessary to this analysis. For a

27  sense of the issue, see *P.P. v. Compton Unified Sch. Dist.*, 135 F. Supp. 3d 1126, 1134–35 (C.D. Cal.
2015) ("The Court will not apply the standard set forth in . . . [*Cottrell*], as it views that standard as
being in conflict with both the Supreme Court's ruling in *Winter* and the Ninth Circuit's own

28  subsequent adoption of the *Winter* standard.") (quoting *Fox Television Stations, Inc. v. BarryDriller*

**1.   Likely to Succeed on Merits?**

Whether the plaintiff is likely to succeed on the merits comes down to the question whether nominal damages are available to the plaintiff. Because, under California law, Mr. Fisher has no actual damages.

It is undisputed that the property in question (580 Garcia) is underwater. Which is to say, the plaintiff owes more on the mortgage loan than the property is worth; the plaintiff thus has negative equity in the property. In California law, a plaintiff who has negative equity in residential property has no damage to support a tort claim seeking to enjoin a foreclosure. *Granadino v. Wells Fargo Bk., N.A.*, 236 Cal. App. 4th 411, 419 (2015). Were this the end of the inquiry, it would be clear that Mr. Fisher could not prevail on the merits.

The "claim" on which Mr. Fisher must likely prevail, though, is for breach of the settlement agreement — which is a form of breach of contract. And there can be no real dispute that, by assigning the lease without the landlord's or the bank's consent, CoCrystal breached its lease with 580 Garcia and thus breached its obligation under § 3 of the settlement agreement. Which brings up the uncertainty: Even without actual damages, Mr. Fisher may be able to recover nominal damages for the contractual breach and so, technically, "prevail on the merits" of his "claim."

Can nominal damages support a contract claim in California? The answer is not clear. The law points in both directions. *See In re Facebook Privacy Litig.*, 192 F. Supp. 3d 1053, 1060–62 (N.D. Cal. 2016) (reviewing authorities). In *Facebook Privacy*, Judge Whyte looked the matter over closely and decided that nominal damages *do* support a contract claim in California. *Id.* This court agrees. Though "uncertainty" on the point runs through the law of California, the Ninth Circuit, and this district, in the end the better view is that nominal damages will support a contract claim in California, "even in the absence of actual damages." *Id.* at 1061–62; *see, e.g.,* Cal. Civ. Code § 3360 ("When a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages."). The court thus concludes that Mr. Fisher would likely prevail on the merits of a contract claim for breach of § 3 of the settlement agreement.

*Content Sys., PLC*, 915 F. Supp. 2d 1138, 1141 (C.D. Cal. 2012)).

### 2. Irreparable Harm

The plaintiff has not shown that he will suffer irreparable harm if foreclosure goes forward. Recall the "no actual damage" point made above. That Mr. Fisher has negative equity in 580 Garcia makes it impossible to say (as a matter of law) that foreclosure would harm him in the sense of his losing money — such as would support a tort claim or actual damages in contract. *See Granadino*, 236 Cal. App. 4th at 419.

What remains an open question — one that the parties have not addressed — is whether foreclosure on (and hence loss of title to) an underwater commercial property can constitute "irreparable harm" for purposes of an injunction. The latter is not the same thing as legal damages, of course, and it could save the plaintiff's position. (It is a rudiment of equity that real-estate parcels are unique, so that money damages do not fully recompense their loss. Saying that the plaintiff has no actual damages, strictly so-called, thus does not preclude his being irreparably harmed for purposes of equitable relief.)

But, again, the parties have not addressed this question. The court thus directs the parties to brief the issue according to the schedule set out in the Conclusion below.

### 3. Balance Of Equities

These probably tip slightly in the plaintiff's favor. The defendants did breach the lease. And they knew that they were breaching the lease: An indemnity term in the acquisition agreement between CoCrystal and MusclePharm specifically contemplates liability flowing from the wrongful assignment of the 580 Garcia lease. *See* (ECF 95-10 at 7).

The court does not wish to overstate this point. It is, after all, a familiar tenet that a breach of contract does not itself constitute or imply bad faith or tortious misconduct. At least not necessarily.[30] On the facts before it, the court cannot say that the defendants breached the lease

---

[30] California's experience in this area has been complicated. After some tumultuous experiments blending tort and contract theories, the state returned to a more traditional view that, among other things (and outside the special area of insurance), denied that contractual breaches necessarily carry tortious or inequitable overtones. *See generally Freeman & Mills, Inc. v. Belcher Oil Co.,* 11 Cal. 4th 85, 90–103 (1995) (discussing precedent) ("[C]onduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law . . .[;] the law

1   (and, by extension, the settlement agreement) in bad faith, or that they otherwise have "unclean

2   hands." To the contrary: The record suggests that assigning the 580 Garcia lease may have been

3   the most sensible practical course available to CoCrystal.[31]

4

5   **4.  Public Interest**

6   The parties say little in this regard. This factor does not play a significant role in this case.

7

8   **5.  The Guaranties**

9   The plaintiff has given absolutely no justification for releasing the guaranties. The parties

10   scarcely address this issue. The plaintiff has not shown that this is a ground on which he is likely

11   to win on the merits. The court thus denies his motion insofar as it asks the court to release him

12   and his wife from the guaranties.

13   \* \* \*

14   **Defendants' Motion to Enforce Settlement (ECF No. 96)**

15   **(Breach of Non-Disparagement Clause)**

16   In their motion to enforce § 24 of the settlement agreement, the "non-disparagement" clause,

17   defendants Brauser and Honig seem basically correct. After agreeing to settle, the plaintiff

18   continued to circulate the very allegations about the defendants that the settlement was supposed

19   to put to bed. These being, most centrally, charges that the defendants were involved in a scheme

20   of "pump and dump" securities fraud.

21

22

23

24

25   generally does not distinguish between good and bad motives for breaching a contract.") (quotation
     omitted).

26

27   [31] The defendants repeatedly insist that Mr. Fisher wanted the mortgagee bank to approve the
     assignment. That's true; he did. But that doesn't mean that he wanted the assignment to go ahead if the
     bank *didn't* approve. Because exactly that unsanctioned assignment led to the note's default and

28   acceleration. Those are two very different things.

ORDER — No. 12-cv-03716-LB                    11

United States District Court
Northern District of California

### 6.  The Plaintiff's Responses

The plaintiff does not dispute the fact that he: (1) filed a new state-court lawsuit that alleged that these defendants had engaged in securities fraud; and (2) emailed a journalist repeating similarly toxic allegations.

The plaintiff makes numerous errors in responding to the defendants' motion. For example, contrary to the plaintiff's suggestion, the settlement's non-denigration term does not implicate First Amendment rights. *See George v. Pacific–CSC Work Furlough*, 91 F.3d 1227, 1229 (9th Cir. 1996); *FreeLife Int'l, Inc. v. Am. Educ. Music Publ'ns Inc.*, 2009 WL 3241795, *5 (D. Ariz. 2009). Nor is the point whether the defendants have established a tort such as defamation. The information that the plaintiff continued to disseminate — accusing the defendants of securities fraud, and informing others that he had filed a whistleblower complaint on the defendants with the SEC — these things are disparaging in the normal sense, and certainly in the broad sense intended by the settlement agreement. Even if what the plaintiff said was old information, and probably even if it was true, this still breached the broad mandate of the settlement agreement's non-disparagement clause. As the defendants rightly observe, the non-disparagement clause says one thing about such matters: *Don't say anything.*

### 7.  Holdings on Disparagement

#### 7.1 Conclusions

The plaintiff violated the non-disparagement clause of the settlement agreement in his email to the journalist Drose. The plaintiff may have breached the clause by communicating with the journalist Buhl and through his attorney Pederson. The court is unwilling to say that the plaintiff also breached the non-disparagement clause by filing a state-court complaint. That raises complex issues that the parties have not started to address.

#### 7.2 Relief

The defendants will be allowed to conduct further discovery into the Buhl and Pederson communications. In a settlement-enforcement decision, even after an already complicated

procedural history, a party was allowed to conduct further discovery to flesh out its case for an injunction. *In re Wachovia Corp. "Pick-A-Payment" Mtge. Mktg. and Sales Pracs. Litig.*, 2013 WL 5424963, *9, *11 (N.D. Cal. Sept. 25, 2013).

The court will not order third parties to remove material from the internet. That's a thicket that the court cannot enter on the briefing before it. That *would* be "state action" against First Amendment rights. To get that result, the defendants would have to make a profoundly stronger showing than they have made.

The court can order sanctions and fees and costs. The cases that the defendants cite (ECF No. 96 at 24) adequately support this proposition.

* * *

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

The court holds as follows:

- The court denies the plaintiff's request to release the plaintiff and his wife from their guaranties.

- The court directs the parties to provide additional briefing on whether foreclosing on an underwater commercial property can constitute "irreparable injury" for purposes of an injunction. The parties must simultaneously file a brief of no more than 10 pages in this issue by Thursday, March 30, 2017. Ruling on this part of the plaintiff's motion is suspended until these briefs are filed.

- The court enjoins the plaintiff from making any further disparaging comments about the defendants. The plaintiff is ordered to fully comply with the settlement agreement's non-disparagement term. Further violations of this term will be considered both a breach of the settlement agreement and contempt of court.

- The court orders the plaintiff to withdraw his FBI and SEC grievances against the defendants, as well as any other such grievances as the plaintiff may have outstanding and which fall within the scope of his commitment under the settlement. He agreed to do this in the settlement agreement and does not deny that he has failed to.

- The court fines Mr. Fisher and Mr. Brauser (not their lawyers) for violating the settlement agreement's non-disparagement clause. Mr. Brauser is fined $250. Mr Fisher is fined $1000. The parties must each choose one of legal-aid groups listed on the State Bar of California's legal-aid program, remit their fine to that organization, and provide proof of having done so within 60 days of this order.

The parties' motions are otherwise denied.

**IT IS SO ORDERED.**

Dated: March 23, 2017

LAUREL BEELER
United States Magistrate Judge